# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Patrick R. Viancourt | ) | CASE NO.  2:20-cv-628 |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| Paragon Wholesale Foods Corp. | ) | |
| | ) | COMPLAINT |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Now comes Plaintiff Patrick R. Viancourt ("Plaintiff"), by and through counsel, and for his complaint against Paragon Wholesale Foods Corporation ("Defendant"), states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is, and at all times relevant to these claims, a natural person and resided at all times in Geauga County, Ohio.

2. Defendant operates as a corporation for profit with its principal place of business in Warrendale, Pennsylvania, which is in Allegheny County.

3. Based on facts alleged in this Complaint, there is complete diversity of citizenship with regard to the adverse parties to this case, conferring jurisdiction of the subject matter and of the person on this Court under 28 U.S.C. § 1332(a) since the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

4. The events that give rise to the allegations of this Complaint occurred in Alleghany County, Pennsylvania; therefore, pursuant to 28 U.S.C. § 1391(b), venue for this case is conferred on this Court.

**FACTUAL BACKGROUND**

5. In the Fall of 2018, Elaine Bellin ("Ms. Bellin"), Chief Executive Officer for Defendant, pursued Plaintiff to join Defendant as its President. Ms. Bellin sought Plaintiff for his experience in managing and operating companies to maximize revenues in order to position Defendant for sale.

6. Upon information and belief, Ms. Bellin owns all, or substantially all, of the shares of the Defendant.

7. On or about January 2, 2019, Plaintiff eventually agreed to join Defendant as its President.

8. On January 28, 2019, Plaintiff and Defendant entered into an Employment Agreement setting forth the terms and conditions of Plaintiff's employment with Defendant ("Employment Agreement"). A copy of the Employment Agreement is attached hereto as Exhibit 1 to the Declaration of Patrick R. Viancourt ("Viancourt Declaration"), which is incorporated herein by reference.

9. The Employment Agreement states in pertinent part:

"1. Definitions.

*"Cause"* — means the occurrence of any of the following events during the Employment Period: (a) Employee's conviction of, or plea of guilty or *nolo contendere* to, a felony (other than a felony arising from, or in connection with, the operation of a motor vehicle) or any crime of moral turpitude; (b) Employee's conviction of, or plea of guilty or *nolo contendere* to, fraud, misappropriation or embezzlement of any business opportunity, funds or property of Employer or its Affiliates (whether attempted or actual); (c) Employee's material breach of this Agreement, or failure to carry out, or comply with, in any material respect, any clear and reasonably attainable directive of the Chief Executive Officer or Board made in good faith and consistent with the terms of this Agreement; (d) the occurrence of negative publicity (newspaper, radio, TV or social media available for public observation) regarding

2

Employee's personal life or conduct that persists for more than 10 consecutive days and which the Chief Executive Officer determines in good faith is harming the reputation of Employer; or (e) Employee's voluntary resignation of his employment; <u>provided</u>, <u>however</u>, that if such breach or failure described in clause (c) is reasonably susceptible to cure, Employer shall notify Employee in writing of the acts believed to constitute such breach or failure, and if Employee corrects or remedies such acts within thirty (30) days after such notice is given, then such breach or failure shall not be deemed to be "Cause" hereunder.

\* \* \*

2.3   <u>Duties/ Succession Plan</u>.

(a)   <u>President</u>.  Employee will serve as the President of Employer, with duties and responsibilities associated with and related to such position and as otherwise reasonably requested in good faith by the Chief Executive Officer or Board consistent with such position.  Employee will: (a) devote substantially all of Employee's business effort, time, energy and skill (vacations and reasonable absences due to illness excepted) as is necessary to fulfill the duties of his position and those assigned by the Board; (b) use his best efforts to promote the success of the such business; and (c) cooperate fully with the reasonable requests of the Chief Executive Officer and Board in the advancement of the best interests of Employer, and its subsidiaries.  Except as provided in this Section 2.3, during the Employment Period, Employee shall not be engaged in or provide services to any other business or Person (whether engaged for profit or not), which interferes with Employee's obligations under this Agreement (unless reasonably consented to in writing by the Chief Executive Officer).

(b)   <u>Succession Plan</u>.  It is the hope and desire of Employer and Employee that during the Employment Period Employee may in the future become Chief Executive Officer of Employer based upon mutually agreed considerations such as prior performance, Employer's success and Employee's willingness to make a multi-year full time commitment.

\* \* \*

3.1   <u>Basic Compensation</u>.

(a)   <u>Salary</u>.  Employer shall pay to Employee an annualized salary at a rate of Two Hundred Ninety-Two Thousand Dollars ($292,000) (the "<u>Salary</u>"), which will be payable in equal periodic installments in accordance with Employer's customary payroll practices minus any local, state or federal tax, or other lawful withholdings.

\* \* \*

3

3.2   Annual Performance Bonus. Each calendar year beginning with 2019 ending during the Employment Period, Employee will be eligible for an annual bonus, with a target annual bonus opportunity equal to a percent of the Salary paid to Employee during such year (the "Annual Performance Bonus"). The annual bonus (the "EBITDA Bonus") will be determined in accordance with the table below based on the achievement of the annual EBITDA budget for Employer and its Affiliates (as determined by the Chief Executive Officer or Board), subject to Employee's continued employment through the end of the applicable year (except as otherwise provided in Section 5 hereof). The EBITDA Bonus amount will be determined by applying linear interpolation for performance between the applicable EBITDA thresholds. Notwithstanding the foregoing, the Chief Executive Officer or Board reserves the right to adjust the table below in its discretion (including, without limitation, to reduce the amount of the EBITDA Bonus that is payable at the various EBITDA thresholds) for any subsequent calendar year in which the annual EBTIDA budget is less than 95% of the EBITDA of Employer and its Affiliates during the preceding calendar year.

| Annual EBITDA (% of Budgeted EBITDA) | EBITDA Bonus Amount |
|---|---|
| Less than 95.0% | 0 |
| 95.0% up to 99.9% | 35% or greater of Salary |
| 100% up to 109.9% | 53% or greater of Salary |
| 110% or greater | 71% or greater of Salary |

The annual bonus, if earned, will be paid promptly following the receipt by Employer of audited financial statements for the calendar year to which the annual bonus relates, but in no event later than April 15 of the calendar year following the calendar year to which such EBITDA Bonus relates. Employer and Employee agree that for purposes of calculating each EBITDA Bonus that any material event that is not in the ordinary course of business of Employer and occurring during the calendar year in which the annual bonus relates shall be excluded from the calculation of the EBITDA Bonus.

3.3   Long-Term Incentive Plan.   During the Employment Period, Employee shall be eligible to participate in a long-term incentive payment in accordance with the Plan as set forth in the attached Exhibit B and as modified time to time in the future by mutual written agreement between the Employer and Employee.  All payments under the Plan will be subject to applicable withholding requirements. In drafting the "Stock Appreciation Rights Plan" to be attached hereto as Exhibit B, Employer and Employee agree that it shall include, but not be limited to, the following:

| Months of Employment | % of Value Creation | % of Value Creation /Vested |
|---|---|---|
| 0-24 | 3% | 0-12 months = 1.5%, 12+ months = 3.0% |

4

| 25-48 | 5% | 24+ months = 4.0%, 36+ months = 5.0% |
| --- | --- | --- |
| 49-60 | 10% | 48+ months = 10% |
| 61+ | 15% | 60+ months = 15% |

Baseline for value creation to the Employer from the Effective Date off of 2018 financials and company value. Employee's right to trigger, in whole or part, vested equity payouts after seventy-two (72) months from Effective Date if change of control (as generally defined by federal tax law) has not occurred, or in the event of termination as expressly set forth in Section 5.2. This also accounts for upside of the value creation on strategic value, not appreciation value. If earnings results are ahead of plan consistent with the next time bound threshold, the % payout jumps to that next threshold. Except for Cause, would receive the vested % of value creation up to the date of termination].

\* \* \*

5. <u>Termination</u>.

    5.1   <u>Events of Termination</u>.

\* \* \*

    (c)   <u>By Employer without Cause</u>.  Employer may terminate Employee's employment with Employer without Cause at any time upon not less than thirty (30) days advance written notice.  Employer may, in its discretion, accelerate the effective date of such termination at any time by further written notice to Employee.

\* \* \*

    5.2   <u>Termination Pay</u>.  Effective upon the termination of the Employment Period but subject to the terms and conditions hereof, Employer will be obligated to pay Employee (or, in the event of his death, his designated beneficiary) only such compensation as is provided in this Section 5.2.  Employee will not receive, as part of his termination pay pursuant to this Section 5.2, any payment for any vacation, holiday, sick leave, or other leave unused on the date the Employment Period terminates.  For purposes of this Section 5.2, Employee's designated beneficiary will be such individual beneficiary or trust, located at such address, as Employee may designate by notice to Employer from time to time or, if Employee fails to give notice to Employer of such a beneficiary, Employee's estate.  Notwithstanding any other provision of this Section 5.2 or this Agreement to the contrary, Employer will begin to pay the amounts provided in Sections 5.2(a) through 5.2(c), or Section 5.2(e) no later than Forty-Five (45) days following the termination of the Employment Period, but only if by such 45th day (i) Employee (or Employee's beneficiary or representative, as applicable) executes and delivers to Employer a Release and Waiver of Claims and (ii) and

any revocation period provided under applicable law has expired without Employee's revocation of the Release and Waiver of Claims. Additionally, Employee will forfeit all amounts owed under this Section 5.2 unless Employee is and continues to be in compliance with the terms of Sections 6 and 7 of this Agreement.

\* \* \*

(c) <u>Termination by Employer Without Cause</u>. If Employer terminates Employee's employment without Cause then (i) prior to the six month anniversary of the Effective Date, Employer will pay to Employee his then current Salary for a period of six (6) months and on or after the six month anniversary of the Effective Date, Employer will pay to Employee his then current Salary for a period of twelve (12) months, in each case in accordance with normal payroll practice and with such payments commencing on the first payroll date following the expiration date for any revocation period available under applicable law with respect to the Release and Waiver of Claims; (ii) if the date of termination of employment occurs within the last six (6) months of a calendar year, pay Employee a pro-rata portion of the Annual Performance Bonus for the year in which the termination of employment occurs (pro-rated based on the number of days Employee was employed in such year) within the time period and subject to the achievement of the performance conditions set forth in Section 3.2; (iii) promptly pay to Employee any Accrued Obligations, and (iv) pay Employee any payments owed to Employee as of the termination of the Employment Period under the Plan as set forth in Section 3.3; <u>provided</u>, <u>however</u>, that upon any breach by Employee of the terms or agreements set forth in Section 6 or Section 7 of this Agreement, Employer's obligation to make such payments shall immediately terminate; Employer shall not be required to commence performance of its obligations under Subsection 5.2(c) (other than the Accrued Obligations) until the regular payroll practice immediately following Employee executing and delivering to Employer the Release and does not revoke the Release."

\* \* \* \*

10. During his employment, Plaintiff was instrumental in making various organizational and sales changes that substantially increased profits and net income of the Defendant.

11. During his employment, Ms. Bellin directed Plaintiff to identify a qualified candidate for the position of Vice President of Sales and Marketing for the Defendant.

6

27085025

12. Plaintiff identified Jeffrey Stone ("Mr. Stone") as a viable candidate for Vice President of Sales and Marketing for the Defendant.

13. Ms. Bellin interviewed Mr. Stone and offered him the position as the Vice President of Sales and Marketing for the Defendant.

14. Mr. Stone accepted the position, quit a very well paid and rewarding position with Delco LLC to join the Defendant, and began his employment on or about March 4, 2019. At all relevant times, Mr. Stone successfully performed all employment activities directed to him by Ms. Bellin and the Defendant.

15. During his employment with the Defendant, Plaintiff objected on various occasions to Ms. Bellin inappropriately using Defendant's financial resources toward personal expenditures, but claiming the expenditures as Defendant's business expenses.

16. On November 13, 2019, without notice or any reasonable explanation, Ms. Bellin directed Plaintiff to terminate Mr. Stone from his position as Vice President of Sales and Marketing for the Defendant. Despite his vehement objection to Ms. Bellin's directive, Plaintiff was forced to terminate Mr. Stone.

17. On November 29, 2019, the day following Thanksgiving, Ms. Bellin notified Plaintiff that his employment with the Defendant was terminated, effective immediately.

18. Ms. Bellin refused to allow Plaintiff to say good-bye to any of Defendant's employees, including Plaintiff's direct reports.

19. During his employment with Defendant, Plaintiff substantially fulfilled all terms and conditions of the Employment Agreement, was never reprimanded, nor did he receive a single negative review from Ms. Bellin or the Defendant.

27085025

20. Following his employment with Defendant, Plaintiff has complied with all post-employment terms and conditions of the Employment Agreement.

21. On December 13, 2019, Ms. Bellin sent Plaintiff an email in which Ms. Bellin stated that Plaintiff "will receive salary continuation, on Paragon's normal payroll schedule, through November 28, 2020. In addition, you are entitled to receive a pro-rated annual bonus in the amount of $173,734.16 payable on or before April 15, 2020." A copy of this December 13, 2019 email is attached hereto as Exhibit 2 to the Viancourt Declaration.

22. Starting with the pay period beginning December 1, 2019, Defendant commenced payment of Plaintiff's Salary continuation and continued making Salary continuation payments up through March 12, 2020.

23. On and after March 13, 2020, Defendant has failed to pay Plaintiff the Salary continuation in accordance with the terms and conditions of the Employment Agreement.

24. Effective March 16, 2020, Pennsylvania Governor Tom Wolf ordered that all restaurants and bars in five Pennsylvania counties, including Allegheny County, must close their dine-in-facilities due to the COVID-19 pandemic.

25. The next day, March 17, 2020, Ms. Bellin left Plaintiff a voice message in which she alluded to the fact that Defendant would not have the funds to pay Plaintiff going forward.

26. Then, on March 18, 2020, Ms. Bellin sent Plaintiff a text message in which she stated that Defendant has been "decimated" and "will not [have] funds to pay you[.]" A copy of this text message is attached hereto as Exhibit 3 to the Viancourt Declaration.

27. Upon information and belief, Defendant has the resources to pay Plaintiff what he is entitled to receive under the Agreement, particularly because the funds for both his pro-rata Annual Performance Bonus and Salary continuation accrued in 2019, which is when Plaintiff earned the Annual Performance Bonus and when his employment was terminated. Instead, Ms. Bellin and Defendant are using the COVID-19 pandemic as a pretext for not paying Plaintiff.

28. Defendant's failure to pay Plaintiff the Salary continuation under the terms and conditions of the Employment Agreement constitutes a default under the agreement. Because of this default, Defendant owes the Plaintiff the total amount of Two Hundred Thirteen Thousand Eight Hundred Forty-Four and 61/100 Dollars ($213,844.61) in Salary continuation payments.

29. On and after April 15, 2020, Defendant failed to pay Plaintiff his pro-rata Annual Performance Bonus in the total amount of One Hundred Seventy-Three Thousand Seven Hundred Thirty-Four and 16/100 Dollars ($173,734.16).

30. Plaintiff has demanded to be paid his Long Term Incentive Plan, in accordance with the terms and conditions of the Employment Agreement, which is believed to be approximately One Hundred Five Thousand Dollars ($105,000.00). Defendant has refused to pay Plaintiff his Long Term Incentive Plan payment.[1]

31. Defendant is in default of the terms and conditions of the Employment Agreement.

---

[1] To confirm the correct Long Term Incentive Plan payment owed, Plaintiff will need to verify this amount through an audit of the Defendant's books and records.

9

27085025

## COUNT ONE

### (Breach of Contract)

32. Plaintiff incorporates the foregoing paragraphs as if fully rewritten herein.

33. Pursuant to the Employment Agreement between Plaintiff and Defendant, a valid and enforceable contract exists between the parties, which required Defendant to pay Plaintiff the approximate total amount of Four Hundred Ninety-Two Thousand Five Hundred Seventy-Eight and 77/100 Dollars ($492,578.77).

34. Plaintiff performed, and continues to perform, all of his obligations pursuant to the Employment Agreement.

35. Defendant has failed to make timely payments to the Plaintiff in accordance with the Employment Agreement.

36. Plaintiff has made demand upon the Defendant for payments due and owing, but Defendant has failed and/or refused to make the payments in accordance with the terms and conditions of the Employment Agreement.

37. Defendant's failure to pay constitutes a breach of contract between the parties.

38. As a direct and proximate result of Defendant's breach of contract, Plaintiff has been damaged in the approximate total amount of Four Hundred Ninety-Two Thousand Five Hundred Seventy-Eight and 77/100 Dollars ($492,578.77) plus applicable pre-judgement interest.

## COUNT TWO

### (Unjust Enrichment)

39. Plaintiff incorporates the foregoing paragraphs as if fully rewritten herein.

40. Plaintiff provided services to Defendant or on its behalf, for which Defendant has benefitted.

41. Defendant has refused to pay Plaintiff for the services he provided.

42. Defendant has been unjustly enriched at the expense of the Plaintiff.

43. On the basis of unjust enrichment and quantum meruit, Plaintiff demands payment from Defendant in the approximate total amount of Four Hundred Ninety-Two Thousand Five Hundred Seventy-Eight and 77/100 Dollars ($492,578.77), plus applicable pre-judgement interest.

WHEREFORE, Plaintiff respectfully demands judgment against Defendant as follows:

(a) For COUNT ONE, judgment against Defendant in favor of Plaintiff in the amount of Four Hundred Ninety-Two Thousand Five Hundred Seventy-Eight and 77/100 Dollars ($492,578.77), plus applicable interest and costs of collection for Defendant's breach of contract;

(b) For COUNT TWO, judgment against Defendant in favor of Plaintiff in the amount of Four Hundred Ninety-Two Thousand Five Hundred Seventy-Eight and 77/100 Dollars ($492,578.77), plus applicable interest and costs of collection for Defendant's unjust enrichment;

(c) Further legal or equitable relief to Plaintiff that this Court deems just and proper.

Respectfully submitted,


*/s/ Cary M. Snyder*
Cary M. Snyder (PA 311143)
*csnyder@taftlaw.com*
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, Ohio 44114
(216) 706-3932
(216) 241-3707 (facsimile)

*Attorney for Plaintiff Patrick R. Viancourt*