# EXHIBIT 1

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made as of January 28th, 2019 ("Effective Date"), between Paragon Wholesale Foods Corp., a Pennsylvania corporation, *dba* Paragon Foods ("Employer") and Patrick R. Viancourt ("Employee").

## RECITAL

Employer desires to employ Employee and Employee desires to accept such employment upon the terms and conditions set forth herein including, without limitation, the restrictive covenants and agreements of Employee set forth in Sections 6 and 7 hereof.

## AGREEMENT

In consideration of the foregoing and the mutual promises and covenants set forth herein, the parties, intending to be legally bound, agree as follows:

1.     Definitions.

For the purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.

"*Affiliate(s)*" — means any Person which, directly or indirectly controls, is controlled by, or is under common control with, any referenced Person.

"*Agreement*" — means this Employment Agreement, including any Exhibits hereto, as amended from time to time.

"*Board*" — means the Board of Directors of Employer, if applicable.

"*Cause*" — means the occurrence of any of the following events during the Employment Period: (a) Employee's conviction of, or plea of guilty or *nolo contendere* to, a felony (other than a felony arising from, or in connection with, the operation of a motor vehicle) or any crime of moral turpitude; (b) Employee's conviction of, or plea of guilty or *nolo contendere* to, fraud, misappropriation or embezzlement of any business opportunity, funds or property of Employer or its Affiliates (whether attempted or actual); (c) Employee's material breach of this Agreement, or failure to carry out, or comply with, in any material respect, any clear and reasonably attainable directive of the Chief Executive Officer or Board made in good faith and consistent with the terms of this Agreement; (d) the occurrence of negative publicity (newspaper, radio, TV or social media available for public observation) regarding Employee's personal life or conduct that persists for more than 10 days and which the Chief Executive Officer determines in good faith is harming the reputation of Employer; or (e) Employee's voluntary resignation of his employment; provided, however, that if such breach or failure described in clause (c) is reasonably susceptible to cure, Employer shall notify Employee in writing of the acts believed to constitute such breach or failure, and if Employee corrects or remedies such acts within thirty (30) days after such notice is given, then such breach or failure shall not be deemed to be "Cause" hereunder.

"*Chief Executive Officer*" — means Elaine Bellin, or her successor as duly elected or appointed in accordance with the Employer's By-Laws.

*"Compensation"* — means the Salary and benefits described in Section 3.

*"Competitive Activity"* — means any management, operations, employment, consulting or ownership interest, alone or together with any other individual or entity, that includes activity relating to the purchase, handling, storage, processing, marketing, advertising, distribution, sale, transport or delivery of produce, dairy, cheese, or dessert products where the end-use or consumption thereof occurs in restaurants or the foodservice industry in Western PA, Eastern OH, and Northern WV.

*"Confidential Information"* — means any and all:

(a)     information concerning the business or affairs of Employer, or its subsidiaries, however documented, whether or not such information is considered a "trade secret" under either common law or any applicable statute, including, but not limited to, historical financial statements, financial projections and budgets, historical and projected sales, capital spending budgets and plans, the names and backgrounds of key personnel, personnel training techniques and materials, product or service specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current, and planned research and development, current and planned manufacturing, marketing or distribution methods and processes, customer lists, prospective customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer software and programs (including object code and source code), computer software and database technologies, systems, structures, and architectures (and related formulae, compositions, processes, improvements, devices, know-how, inventions, discoveries, concepts, ideas, designs, methods and information), and any other information, however documented, that is a "trade secret" either under common law or as such term is defined by statute under the laws of any applicable jurisdiction; and

(b)     notes, analysis, compilations, studies, summaries, and other materials prepared by or for Employer or Affiliates of Employer, containing or based, in whole or in part, on any information included in the foregoing.

*"Disability"* — means any physical or mental impairment because of which Employee is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of at least ninety (90) consecutive days or one hundred eighty (180) days during any twelve (12) consecutive month period.

*"EBITDA"* — means Employer's accounting methods used in the ordinary course of business for the tax years 2016 through 2018.

*"Employer"* — means Paragon Wholesale Foods Corp., a Pennsylvania corporation, and its registered fictitious names, successors and assigns.

*"Employment Period"* — means the period of time during which Employee is employed by Employer.

*"Good Reason"* — means the occurrence of any of the following events during the Employment Period without Employee's prior written consent: (a) a requirement that Employee change his permanent place of residence to a location different than Employee's residence as of the

Effective Date; (b) a reduction of Employee's then-current Salary, except where such reduction is generally applicable and commensurate to Employer's other senior management team employees; (c) a material and substantial reduction in Employee's position or responsibilities; or (d) any failure by Employer to comply with any material provision of this Agreement that has not been cured within thirty (30) days after written notice of such noncompliance has been delivered by Employee to Employer.

"*Invention*" — means any idea, invention, technique, modification, process, or improvement (whether patentable or not), and any work of authorship (whether or not copyright protection may be obtained for it) created, conceived, or developed by Employee, either solely or in conjunction with others, during the Employment Period, or a period that includes a portion of the Employment Period, that relates in any way to, or is useful in any manner in, the business then being conducted or proposed to be conducted by Employer or any of its Affiliates, and any such item created by Employee, either solely or in conjunction with others, following termination of Employee's employment with Employer or any of its Affiliates, that is based upon or uses Confidential Information.

"*Non-Competition Period*" — means the period of time during the Employment Period, plus one (1) year thereafter.

"*Person*" — means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, or governmental body.

"*Plan*" — means the Long-Term Incentive Plan entered into between Employer and Employee.

"*Release and Waiver of Claims*" — means a written release and waiver by Employee in the form attached as Exhibit A hereto.

2.     Employment Term and Duties.

2.1     Employment.     Employer hereby employs Employee, effective as of the Effective Date, and Employee shall accept employment by Employer, effective as of the date hereof, upon the terms and conditions set forth in this Agreement.

2.2     Term.     Employee's employment shall begin on the date hereof and continue until terminated in accordance with the provisions of Section 5 hereof.

2.3     Duties/ Succession Plan.

(a)     President.     Employee will serve as the President of Employer, with duties and responsibilities associated with and related to such position and as otherwise reasonably requested in good faith by the Chief Executive Officer or Board consistent with such position. Employee will: (a) devote substantially all of Employee's business effort, time, energy and skill (vacations and reasonable absences due to illness excepted) as is necessary to fulfill the duties of his position and those assigned by the Board; (b) use his best efforts to promote the success of the such business; and (c) cooperate fully with the reasonable requests of the Chief Executive Officer and Board in the advancement of the best interests of Employer, and its

subsidiaries. Except as provided in this Section 2.3, during the Employment Period, Employee shall not be engaged in or provide services to any other business or Person (whether engaged for profit or not), which interferes with Employee's obligations under this Agreement (unless reasonably consented to in writing by the Chief Executive Officer).

(b)     Succession Plan.     It is the hope and desire of Employer and Employee that during the Employment Period Employee may in the future become Chief Executive Officer of Employer based upon mutually agreed considerations such as prior performance, Employer's success and Employee's willingness to make a multi-year full time commitment.

3.     Compensation; Vacation and Holidays.

    3.1     Basic Compensation.

(a)     Salary.     Employer shall pay to Employee an annualized salary at a rate of Two Hundred Ninety-Two Thousand Dollars ($292,000) (the "Salary"), which will be payable in equal periodic installments in accordance with Employer's customary payroll practices minus any local, state or federal tax, or other lawful withholdings.

(b)     Signing Bonus.     Employer shall pay to Employee a one-time signing bonus of Fifty Thousand Dollars ($50,000) ("Signing Bonus") which will be payable to Employee in his first payroll installment minus any local, state or federal tax, or other lawful withholdings, provided however, should Employee's employment terminate with Cause or without Good Reason prior to the second anniversary of the Effective Date, Employee shall pay to Employer an amount equal to the Signing Bonus within thirty (30) days.

(c)     Benefits.     Employee will, during the Employment Period, be entitled to participate in such profit sharing, 401k, life insurance, hospitalization, medical or dental plans or insurance coverage, disability, and other employee benefit plans, programs and policies of Employer in effect from time to time (collectively, the "Benefits Plans"), vacation and holidays (as further provided in Section 3.4 below), and any other plan which may be made available by Employer to its key management employees from time to time in the future, if, and to the extent that, Employee is eligible under the terms of such Plans. Any benefits granted to or received by Employee hereunder shall be subject to such local, state or federal tax reporting requirements as may be in effect at any time during the Employment Period.

3.2     Annual Performance Bonus. Each calendar year beginning with 2019 ending during the Employment Period, Employee will be eligible for an annual bonus, with a target annual bonus opportunity equal to a percent of the Salary paid to Employee during such year (the "Annual Performance Bonus"). The annual bonus (the "EBITDA Bonus") will be determined in accordance with the table below based on the achievement of the annual EBITDA budget for Employer and its Affiliates (as determined by the Chief Executive Officer or Board), subject to Employee's continued employment through the end of the applicable year (except as otherwise provided in Section 5 hereof). The EBITDA Bonus amount will be determined by applying linear interpolation for performance between the applicable EBITDA thresholds. Notwithstanding the foregoing, the Chief Executive Officer or Board reserves the right to adjust the table below in its discretion (including, without limitation, to reduce the amount of the EBITDA Bonus that is payable at the various EBITDA thresholds) for any subsequent calendar year in which the annual EBTIDA budget

4

is less than 95% of the EBITDA of Employer and its Affiliates during the preceding calendar year.

| Annual EBITDA (% of Budgeted EBITDA) | EBITDA Bonus Amount |
|---|---|
| Less than 95.0% | 0 |
| 95.0% up to 99.9% | 35% or greater of Salary |
| 100% up to 109.9% | 53% or greater of Salary |
| 110% or greater | 71% or greater of Salary |

   The annual bonus, if earned, will be paid promptly following the receipt by Employer of audited financial statements for the calendar year to which the annual bonus relates, but in no event later than April 15 of the calendar year following the calendar year to which such EBITDA Bonus relates. Employer and Employee agree that for purposes of calculating each EBITDA Bonus that any material event that is not in the ordinary course of business of Employer and occurring during the calendar year in which the annual bonus relates shall be excluded from the calculation of the EBITDA Bonus.

   3.3 Long-Term Incentive Plan. During the Employment Period, Employee shall be eligible to participate in a long-term incentive payment in accordance with the Plan as set forth in the attached Exhibit B and as modified time to time in the future by mutual written agreement between the Employer and Employee. All payments under the Plan will be subject to applicable withholding requirements. In drafting the "Stock Appreciation Rights Plan" to be attached hereto as Exhibit B, Employer and Employee agree that it shall include, but not be limited to, the following:

| Months of Employment/ % of Value Creation | | % of Value Creation /Vested |
|---|---|---|
| 0-24 | 3% | 0- 12 months = 1.5%, 12+ months = 3.0% |
| 25-48 | 5% | 24+ months = 4.0%, 36+ months = 5.0% |
| 49-60 | 10% | 48+ months = 10% |
| 61+ | 15% | 60+ months = 15% |

Baseline for value creation to the Employer from the Effective Date off of 2018 financials and company value. Employee's right to trigger, in whole or part, vested equity payouts after 72 months from Effective Date if change of control (as generally defined by federal tax law) has not occurred, or in the event of termination as expressly set forth in Section 5.2. This also accounts for upside of the value creation on strategic value, not appreciation value. If earnings results are ahead of plan consistent with the next time bound threshold, the % payout jumps to that next threshold. Except for Cause, would receive the vested % of value creation up to the date of termination].

   3.4 Vacations and Holidays. Beginning on the date of this Agreement, Employee will be entitled to up to 25 calendar days of paid vacation annually during the Employment Period. Employee will also be entitled to the paid holidays as set forth in Employer's policies. Vacation days and holidays during any calendar year that are not used by Employee during such calendar year may not be used in any subsequent calendar year, nor will Employee be paid for unused vacation or holidays. Employee will utilize paid vacation and holidays in accordance with the vacation and holiday policies of Employer in effect for its executive officers from time to time.

4. Equipment, Expenses, Local Lodging, and Business Expenses. Employer will furnish Employee with equipment, supplies, computer and facsimile equipment, telephones, local residential lodging (Marriott Residence Inn or similar), weekly travel expenses including per diem allowance, and such other support as Employee and Employer deem mutually necessary or appropriate for the performance of Employee's duties under this Agreement. Employer will reimburse Employee for all reasonable business expenses incurred by him on behalf of Employer in the performance of his duties; provided, that Employee furnishes to Employer documentation of such expenses as is required by the Internal Revenue Service, as well as such other documentation as Employer may reasonably request. Employee must file authorization requests, to the extent required by Employer's employment policies and, in all instances, expense reports with respect to such expenses in accordance with Employer's policies in effect from time to time applicable to other management employees.

5. Termination.

5.1 Events of Termination.

(a) Death; Disability. In the event of Employee's death or Disability, his employment with Employer shall be deemed terminated as of the end of the month in which such death occurs or such Disability is determined to have occurred.

(b) By Employer for Cause. Employee's employment with Employer may be terminated immediately at the option of and by written notice from Employer to Employee if the Chief Executive Officer or Board in good faith determine that Employee has acted (or has refrained from acting) in such a manner that a termination of employment for Cause exists.

(c) By Employer without Cause. Employer may terminate Employee's employment with Employer without Cause at any time upon not less than thirty (30) days advance written notice. Employer may, in its discretion, accelerate the effective date of such termination at any time by further written notice to Employee.

(d) By Employee without Good Reason. Employee may terminate his employment with Employer without Good Reason upon not less than thirty (30) days advance written notice to Employer; provided, however, that after the receipt of such notice, Employer may, in its discretion, accelerate the effective date of such termination at any time by written notice to Employee.

(e) By Employee with Good Reason. Employee may terminate his employment with Employer with Good Reason upon not less than thirty (30) days advance written notice to Employer, which notice shall specify, in reasonable detail, Employee's basis for alleging Good Reason; provided, however, that after the receipt of such notice, Employer may, in its discretion, accelerate the effective date of such termination at any time by written notice to Employee.

5.2 Termination Pay. Effective upon the termination of the Employment Period but subject to the terms and conditions hereof, Employer will be obligated to pay Employee (or, in the event of his death, his designated beneficiary) only such compensation as is provided in this Section 5.2. Employee will not receive, as part of his termination pay pursuant to this Section 5.2, any payment for any vacation, holiday, sick leave, or other leave unused on the date the

Employment Period terminates. For purposes of this Section 5.2, Employee's designated beneficiary will be such individual beneficiary or trust, located at such address, as Employee may designate by notice to Employer from time to time or, if Employee fails to give notice to Employer of such a beneficiary, Employee's estate. Notwithstanding any other provision of this Section 5.2 or this Agreement to the contrary, Employer will begin to pay the amounts provided in Sections 5.2(a) through 5.2(c), or Section 5.2(e) no later than Forty-Five (45) days following the termination of the Employment Period, but only if by such 45th day (i) Employee (or Employee's beneficiary or representative, as applicable) executes and delivers to Employer a Release and Waiver of Claims and (ii) and any revocation period provided under applicable law has expired without Employee's revocation of the Release and Waiver of Claims. Additionally, Employee will forfeit all amounts owed under this Section 5.2 unless Employee is and continues to be in compliance with the terms of Sections 6 and 7 of this Agreement.

(a) <u>Termination upon Death</u>. If the Employment Period is terminated because of Employee's death, Employer will (i) in accordance with regular payroll practice pay to Employee's designated beneficiary Employee's Salary for a period of thirty (30) days following the effective date of the termination of the Employment Period, (ii) promptly pay to Employee's designated beneficiary any earned but unpaid Salary, any accrued but unused vacation days as of the effective date of termination of the Employment Period, and any business expenses paid by Employee, but not yet reimbursed prior to termination (collectively "<u>Accrued Obligations</u>"), and (iii) pay Employee's designated beneficiary any payments owed to Employee as of the termination of the Employment Period under the Plan as set forth in Section 3.3.

(b) <u>Termination upon Disability</u>. If this Agreement is terminated by either party as a result of Employee's Disability, (i) Employer will, in accordance with normal payroll practice, continue to pay to Employee an amount equal to his Salary for a period of thirty (30) days following the effective date of the termination of the Employment Period, (ii) promptly pay to Employee any Accrued Obligations, and (iii) pay Employee any payments owed to Employee as of the termination of the Employment Period under the Plan as set forth in Section 3.3.

(c) <u>Termination by Employer Without Cause</u>. If Employer terminates Employee's employment without Cause then (i) prior to the six month anniversary of the Effective Date, Employer will pay to Employee his then current Salary for a period of six (6) months and on or after the six month anniversary of the Effective Date, Employer will pay to Employee his then current Salary for a period of twelve (12) months, in each case in accordance with normal payroll practice and with such payments commencing on the first payroll date following the expiration date for any revocation period available under applicable law with respect to the Release and Waiver of Claims; (ii) if the date of termination of employment occurs within the last six (6) months of a calendar year, pay Employee a pro-rata portion of the Annual Performance Bonus for the year in which the termination of employment occurs (pro-rated based on the number of days Employee was employed in such year) within the time period and subject to the achievement of the performance conditions set forth in Section 3.2; (iii) promptly pay to Employee any Accrued Obligations, and (iv) pay Employee any payments owed to Employee as of the termination of the Employment Period under the Plan as set forth in Section 3.3; provided, however, that upon any breach by Employee of the terms or agreements set forth in Section 6 or Section 7 of this Agreement, Employer's obligation to make such payments shall immediately terminate; Employer shall not be required to commence performance of its obligations under Subsection 5.2(c) (other than the

Accrued Obligations) until the regular payroll practice immediately following Employee executing and delivering to Employer the Release and does not revoke the Release.

(d)     Termination by Employee Without Good Reason.    If Employee terminates his employment for any reason other than Good Reason, Employer shall (i) continue to pay to Employee his Salary, in accordance with normal payroll practice, for the period of time that Employee remains employed by Employer, (ii) promptly pay any payments of any Annual Performance Bonus which has been fully earned but remains unpaid from the calendar year immediately preceding the termination and subject to the achievement of the performance conditions set forth in Section 3.2, (iii) promptly pay to Employee any Accrued Obligations, and (iv) pay Employee any payments owed to Employee as of the termination of the Employment Period under the Plan as set forth in Section 3.3

(e)     Termination by Employee with Good Reason.    If Employee terminates his employment with Good Reason at any time prior to the six month anniversary of the Effective Date, (i) Employer will pay to Employee his then current Salary for a period of six (6) months and on or after the six month anniversary of the Effective Date, Employer will pay to Employee his then current Salary for a period of twelve (12) months, in each case in accordance with normal payroll practice and with such payments commencing on the first payroll date following the expiration date for any revocation period available under applicable law with respect to the Release and Waiver of Claims; (ii) if the date of termination of employment occurs within the last six (6) months of a calendar year, Employee a pro-rata portion of the Annual Performance Bonus for the year in which the termination of employment occurs (pro-rated based on the number of days Employee was employed in such year) within the time period and subject to the achievement of the performance conditions set forth in Section 3.2; (iii) Employee any Accrued Obligations, and (iv)  payments owed to Employee as of the termination of the Employment Period under the Plan as set forth in Section 3.3; provided, however, that upon any breach by Employee of the terms or agreements set forth in Section 6 or Section 7 of this Agreement, Employer's obligation to make such payments shall immediately terminate  Employer shall not be required to commence performance of its obligations under Subsection 5.2(e) (other than the Accrued Obligations) until the regular payroll practice immediately following Employee executing and delivering to Employer the Release and does not revoke the Release.

(f)     Termination by Employer with Cause.    If Employer terminates Employee's employment for Cause, Employer's obligation to pay Employee any Compensation shall immediately terminate.

Notwithstanding anything contained herein to the contrary effective upon the termination of the Employment Period, Employer shall also reimburse Employee for the unpaid portion of any business expenses incurred by Employee on behalf of Employer in the performance of his duties during the Employment Period in accordance with Section 3 above.

5.3     Continuation of Benefits.    Following the coverage termination date under Employer's group medical, life and long-term disability insurance plans, Employee, his spouse and his dependents shall be entitled to continuation of coverage at their expense pursuant to any statutory rights Employee may then have for such continuation coverage (whether under part VI of Subtitle B of Title I of the Executive Retirement Income Security Act of 1974, as amended, or Section 4980B of the Internal Revenue Code of 1986, as amended, or otherwise).    Such

continuation coverage shall be provided in accordance with applicable law and the terms of the Benefits Plans as they may be amended from time to time and shall be afforded no longer than the period provided by law and only to the extent that Employee, his spouse and his dependents comply with all payment obligations and conditions of such continuation coverage on a timely basis.

      6.     Non-Disclosure Covenant; Employee Inventions; Non-Disparagement.

      6.1    Acknowledgments by Employee.  Employee acknowledges that (a) during the Employment Period and as a part of his employment, Employee will be afforded access to Confidential Information; (b) public disclosure of such Confidential Information could have an adverse effect on Employer and its business; (c) since Employee possesses substantial expertise and skill with respect to Employer's business, Employer desires to obtain exclusive ownership of each Employee Invention, and Employer will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each Invention; (d) the Compensation provided to Employee hereunder constitutes good and sufficient consideration for Employee's agreements and covenants in this Section 6; (e) the provisions of this Section 6 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Employer with exclusive ownership of all Inventions; and (f) a breach by Employee of the covenants contained in this Section 6 is not susceptible to cure.

      6.2    Agreements of Employee.  In consideration of the Compensation to be paid or provided to Employee by Employer under this Agreement, Employee covenants as follows:

      (a)    Confidentiality.

      (i)    During and at all times following the Employment Period, Employee will hold in confidence the Confidential Information and will not disclose it to any Person except (A) with the specific prior written consent of Employer, (B) as required by law, summons, subpoena or interrogatories (provided that Employee shall provide Employer with as much notice of such required disclosure as is reasonably possible), or (C) as otherwise reasonably required in the performance of Employee's duties and obligations hereunder or expressly permitted by the terms of this Agreement.

      (ii)    Any trade secrets of Employer will be entitled to all of the protections and benefits under applicable trade secret laws. If any information that Employer deems to be a trade secret is found by a court of competent jurisdiction not to be a trade secret for purposes of this Agreement, such information will, nevertheless, be considered Confidential Information for purposes of this Agreement. Employee hereby waives any requirement that Employer submit proof of the economic value of any trade secret or post a bond or other security.

      (iii)    None of the foregoing obligations and restrictions applies to any part of the Confidential Information that Employee demonstrates was or became generally available to the public other than as a result of a disclosure by Employee.

      (iv)    Employee will not remove from Employer's (or any Affiliate's) premises (except to the extent such removal is for purposes of the performance of Employee's duties at home or while traveling, or except as otherwise specifically authorized by Employer) any document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items").

Employee recognizes that, as between Employer and Employee, all of the Proprietary Items, whether or not developed by Employee, are the exclusive property of Employer. Upon termination of this Agreement by either party, Employee will return to Employer all of the Proprietary Items in Employee's possession or subject to Employee's control, and Employee shall not retain any copies, abstracts, sketches, or other physical embodiment of any of the Proprietary Items.

(b)     Inventions.  Each Invention will belong exclusively to Employer. Employee acknowledges that all of Employee's writing, works of authorship, and other Inventions are works made for hire and the property of Employer, including any copyrights, patents, or other intellectual property rights pertaining thereto.  If it is determined that any such works are not works made for hire, Employee hereby assigns to Employer all of Employee's right, title, and interest, including all rights of copyright, patent, and other intellectual property rights, to or in such Inventions.  Employee covenants that he will promptly:

(i)     disclose to Employer in writing any Invention;

(ii)     assign to Employer or to a party designated by Employer, at Employer's request and without additional compensation, all of Employee's right to any Invention for the United States and all foreign jurisdictions;

(iii)     without further compensation, execute and deliver to Employer such applications, assignments, and other documents as Employer may request in order to apply for and obtain patents or other registrations with respect to any Invention in the United States and any foreign jurisdictions;

(iv)     sign all other papers necessary to carry out the above obligations; and

(v)     give testimony and render any other assistance at Employer's expense, in support of Employer's rights to any Invention.

7.     Non-Competition and Non-Interference.

7.1     Acknowledgments By Employee.  Employee acknowledges that: (a) the services to be performed by him under this Agreement are of a special, unique and unusual character; (b) the Compensation provided to Employee hereunder constitutes good and sufficient consideration for Employee's agreements and covenants in this Section 7; (c) the provisions of this Section 7 are reasonable and necessary to protect Employer's business; and (d) a breach by Employee of the covenants contained in this Section 7 is not susceptible to cure.

7.2     Covenants of Employee.  In consideration of the acknowledgments by Employee, and in consideration of the Compensation to be paid or provided to Employee by Employer, Employee covenants that he will not, directly or indirectly, whether or not for consideration:

(a)     during the Non-Competition Period, (i) engage in any Competitive Activity; or (ii) engage in any practice, the purpose or effect of which is to intentionally evade the provisions of this covenant; provided, however, that Employee may purchase or otherwise acquire up to (but not more than) five percent (5%) of any class of securities of any business that engages in

{02957587.DOC;1 }
24111080.4

10

Competitive Activity (but without otherwise participating in the activities of such business) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934; or

(b)      during the Non-Competition Period, whether for Employee's own account or the account of any other person (i) solicit or induce, directly or indirectly, whether or not for consideration, any employee or agent of Employer to terminate his or her relationship with Employer; or (ii) induce or attempt to induce any supplier or contractor of Employer to terminate or adversely change its relationship with Employer or otherwise interfere with any relationship between Employer and any of its suppliers or contractors; or (iii) employ, hire or solicit the employment of any person who was an employee of Employer at any time during the preceding twelve (12) months immediately prior to the termination of the Employment Period; or (iv) do any act to impair, prejudice or harm the goodwill of Employer, or to prejudice or impair the relationship or dealing between Employer and any of their customers, suppliers, contractors, designers, licensees, employees or other business relations.

7.3      Enforceability; Notice.      If any covenant in Section 7.2 is held to be unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary, and not against public policy, will be effective, binding, and enforceable against Employee. The period of time applicable to any covenant in Section 7.2 will be extended by the duration of any violation by Employee of such covenant. If Employee accepts other employment while the covenant under Section 7.2 is in effect, Employer may notify such employer that Employee is bound by this Agreement and, at Employer's election, furnish such employer with a copy of this Agreement or relevant portions thereof.

8.      General Provisions.

8.1      Injunctive Relief and Additional Remedy.      Employee acknowledges that the injury that would be suffered by Employer as a result of a breach of the provisions of this Agreement (including any provision of Section 6 and Section 7) would be irreparable and that an award of monetary damages to Employer for such a breach would be an inadequate remedy. Consequently, Employer will have the right, in addition to any other rights it may have, at Employer's cost, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement, and Employer will not be required to prove actual damages or obligated to post bond or other security in seeking such relief.

8.2      Covenants of Sections 6 and 7 are Essential and Independent. The covenants by Employee in Section 6 and Section 7 are essential elements of this Agreement, and without Employee's agreement to comply with such covenants, Employer would not have entered into this Agreement, offered employment to Employee or offered Employee the Compensation and other consideration provided hereunder.      Employee's covenants in Section 6 and Section 7 are independent covenants and the existence of any claim by Employee against Employer under this Agreement or otherwise, or against any subsidiary of Employer, will not excuse Employee's breach of any covenant in Section 6 or Section 7. If Employee's employment hereunder terminates, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Employee in Section 6 and Section 7.

8.3   <u>Representations and Warranties by Employee</u>.  Employee represents and warrants to Employer that the execution and delivery by Employee of this Agreement do not, and the performance by Employee of Employee's obligations hereunder will not, with or without the giving of notice or the passage of time, or both: (a) violate any judgment, writ, injunction, or order of any court, arbitrator, or governmental agency applicable to Employee; or (b) conflict with, result in the breach of any provisions of or the termination of, or constitute a default under, any agreement to which Employee is a party or by which Employee is or may be bound.  If requested by the Chief Executive Officer or Board, Employee must submit to a mental or physical examination to enable the Chief Executive Officer or Board to make a determination of Employee's "Disability" for purposes of this Agreement.

8.4   <u>Obligations Contingent on Performance</u>.   The obligations of Employer hereunder, including its obligation to pay the Compensation provided for herein, are contingent upon Employee's performance of Employee's obligations hereunder.

8.5   <u>Waiver</u>.   The rights and remedies of the parties to this Agreement are cumulative and not alternative.  Neither the failure nor any delay by either party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

8.6   <u>Binding Effect; Delegation of Employee's Duties Prohibited</u>.   This Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors, assigns, heirs, and legal representatives, including any Affiliate to which Employer may assign this Agreement or any entity with which Employer may merge or consolidate or to which all or substantially all of its assets may be transferred.  The duties and covenants of Employee under this Agreement, being personal, may not be delegated or assigned.

8.7   <u>Notices</u>.   All notices required to be given or delivered pursuant to this Agreement shall be in writing, and shall be given or delivered as follows:

If to Employer:   Paragon Wholesale Foods Corp.
173 Thorn Hill Road
Warrendale, PA 15086
Attention: Elaine Bellin, Chief Executive Officer
E-Mail: elaine.bellin@paragonfoods.net

If to Employee:   Patrick R. Viancourt
17350 Old Tannery Trail
Chagrin Falls, Ohio 44023
E-Mail: pviancourt@msn.com

or in any case, to such other address for a party as to which notice shall have been given to each other parties hereto in accordance with this Section. Notices so addressed shall be deemed to have been duly given (i) on the third business day after the day of registration, if sent by registered or certified U.S. Mail, first-class postage prepaid, or (ii) on the next business day following the documented acceptance thereof for next-day delivery by a national overnight air courier service, or (iii) on the date of hand delivery. Otherwise, notices shall be deemed to have been given when delivered to such address.

8.8     Entire Agreement; Amendments. This Agreement, as it may be amended from time to time, contains the entire agreement between the parties with respect to the subject matter hereof and other agreements or understandings, oral or written, between the parties hereto with respect to the subject matter hereof. This Agreement may not be amended orally, but only by an agreement in writing signed by the parties hereto.

8.9     Governing Law; Venue and Jurisdiction. This Agreement shall be governed by and construed under Pennsylvania law, without regard to conflict of laws principles. The parties agree that any lawsuit between them arising under this Agreement shall be filed in any state or federal court located in, or within the jurisdiction of, Alleghany County, Pennsylvania, and each of the parties hereby agrees, acknowledges and submits itself to the exclusive jurisdiction and venue of such courts for the purposes of such lawsuit, waives any right he or it may have to object to such jurisdiction, and agrees to accept service of process in accordance with the provisions for delivery of notice set forth in Section 8.7 hereof.

8.10     Section Headings; Construction. The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement unless otherwise specified. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

8.11     Severability.     If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

8.12     Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

8.13     Maintenance of Exemption from Code Section 409A. It is the intention and purpose of Employer and Employee that this Agreement shall be deemed to be at all relevant times exempt from or in compliance with Section 409A of the Internal Revenue Code of 1986, as amended, and all other applicable laws. If any payment hereunder subject to Employee's execution of a Release and Waiver of Claims is considered "deferred compensation" for purposes of Section 409A and the period for executing such Release and Waiver of Claims commences in one calendar year and ends in the following calendar year, then payment of such deferred compensation shall be made or commence in the second calendar year. This Agreement shall be so interpreted and is

13

intended to be so administered.   However, notwithstanding anything in this Agreement to the contrary, Employer makes no representations or warranties as to the tax effects of payments made to Employee pursuant to this Agreement, and any and all tax consequences incident to such shall solely be the responsibility of Employee, or any successor-in-interest.

**[Remainder of Page Left Intentionally Blank. Signature Page to Follow]**

IN WITNESS WHEREOF, the parties have executed and delivered this Employment Agreement as of the Effective Date.

PARAGON WHOLESALE FOODS CORP.

By: _____
     Elaine Bellin, Chief Executive Officer


_____
Patrick R. Viancourt

[Employment Agreement Signature Page]

## Exhibit A

### Release and Waiver of Claims

See attached.

## RELEASE AND WAIVER OF CLAIMS

This Release and Waiver of Claims, dated as of DECEMBER 4ᵗʰ, 2019 (this "Release"), is given by Patrick R. Viancourt, an individual ("Releasor"). Capitalized terms used but not defined herein have the meanings assigned to them in that certain Employment Agreement, dated February 1, 2018 (the "Employment Agreement"), between Releasor and Paragon Wholesale Foods Corp. ("Employer").

As a condition to receipt of certain payments from Employer under Section 5.2 of the Employment Agreement, Releasor has agreed to execute and deliver this Release.

1.     For good and valuable consideration, including, without limitation, the payments due to Releasor pursuant to Section 5.2 of the Employment Agreement, the receipt and legal sufficiency of which is acknowledged by Releasor, Releasor, on behalf of Releasor and each of Releasor's heirs, executors, administrators and assigns, knowingly and voluntarily releases and forever discharges Employer and its Affiliates and each of their respective shareholders, members, partners, directors, officers, managers, employees, agents and representatives and the successors and assigns of all of the foregoing (collectively, the "Released Parties") from any and all claims, controversies, actions, causes of action, cross-claims, counter-claims, rights, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, obligations or liabilities (including, without limitation, any rights or obligations arising out of or related to Releasor's employment (or the termination thereof) with Employer or any Affiliate or subsidiary of any nature whatsoever in law and in equity, both past and present (through the date of this Release) and whether known or unknown, suspected, or claimed against any of the Released Parties that Releasor or any of his heirs, executors, administrators and assigns may have, relating in any way to or in connection with any matter or thing from the beginning of the world through the date of this Release (all of the foregoing collectively referred to herein as the "Claims") including, without limitation, any Claims under any federal, state, local or foreign law, that Releasor may have, have ever had or may in the future have arising out of, or in any way related to (i) Releasor's hire, benefits, employment, termination or separation from employment with Employer and (ii) any actual or alleged act, omission, transaction, practice, conduct, occurrence or other matter that existed or arose on or before, and including, the date of his execution of this Release, including, but not limited to (i) any Claims under Title VII of the Civil Rights Act, as amended, the Americans with Disabilities Act, as amended, the Family and Medical Leave Act, as amended, the Employee Retirement Income Security Act, as amended (with respect to unvested benefits), the Civil Rights Act of 1991, as amended, Section 1981 of U.S.C. Title 42, the Sarbanes-Oxley Act of 2002, as amended, the Worker Adjustment and Retraining Notification Act, as amended, the Age Discrimination in Employment Act, as amended, the Genetic Information Nondiscrimination Act of 2008, and/or any other Federal, state or local law (statutory, regulatory or otherwise) that may be legally waived and released and (ii) any tort and/or contract Claims, including, but not limited to, any claims of wrongful discharge, defamation, emotional distress, tortious interference with contract, invasion of privacy, nonphysical injury, personal injury or sickness or any other harm; provided, however, that notwithstanding any other provision of this Release, Releasor shall be entitled to receive (i) (A) the portion of Releasor's salary and bonus payable in the ordinary course of business that is earned as of the date hereof but not yet paid to Releasor by Employer, and (B) any expense reimbursements owed to Releasor as of the date hereof by Employer in accordance with the policies of Employer; provided further, that notwithstanding any other provision of this Release, nothing in this Release shall operate to release or affect or alter

{02957587.DOC;1 }
24111080.4

17

any rights or interest held by Releasor (1) relating to any equity or debt interest in any Released Party, or (2) relating to any indemnification, contribution, exculpation, insurance and expense reimbursement and advancement provisions in favor of Releasor under any organizational document or insurance policy of any Released Party or pursuant to any agreement entered into by or between any Released Party and Releasor.

2.     Releasor represents that neither Releasor nor any of Releasor's Affiliates has made an assignment or transfer of any of the Claims.

3.     In signing this Release, Releasor, on behalf of Releasor and each of Releasor's Affiliates, acknowledges and intends that it shall be effective as a bar to each and every one of the Claims. Releasor expressly consents that this Release shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state statute that expressly limits the effectiveness of a general release of unknown, unsuspected or unanticipated Claims), if any, as well as those relating to any other Claims herein above mentioned or implied. Releasor, on behalf of Releasor and each of Releasor's heirs, executors, administrators and assigns, acknowledges and agrees that this waiver is an essential and material term of this Release and that without such waiver Employer would not have agreed to make the payments contemplated by Section 5.2 of the Employment Agreement. Releasor, on behalf of Releasor and each of Releasor's heirs, executors, administrators and assigns, further agrees that in the event Releasor should assert any Claim seeking damages against any of the Released Parties, this Release shall serve as a complete defense to any such Claim. Releasor, on behalf of Releasor and each of Releasor's heirs, executors, administrators and assigns, further agrees that Releasor is not aware of any pending or threatened Claims of the type described in or implied by Section 1 hereof, and after giving effect to the release set forth in Section 1, there does not exist any Claim.

4.     Releasor, on behalf of Releasor and each of Releasor's heirs, executors, administrators and assigns, agrees that neither this Release, nor the furnishing of the consideration for this Release, shall be deemed or construed at any time to be an admission by any Released Party or Releasor (or his heirs, executors, administrators and assigns) of any improper or unlawful conduct.

5.     Releasor also agrees that if Releasor or any of Releasor's heirs, executors, administrators and assigns violates this Release by suing any Released Parties, Releasor or his heirs, executors, administrators and assigns will pay all reasonable costs and expenses of defending against the suit incurred by the Released Parties, including reasonable attorneys' fees.

6.     Releasor, on behalf of Releasor and each of Releasor's heirs, executors, administrators and assigns, acknowledges and agrees that Releasor and/or Releasor's heirs, executors, administrators and assigns may hereafter discover facts different from or in addition to those now known, or believed to be true, regarding the subject matter of this Release and further acknowledges and agrees that this Release shall remain in full force and effect, notwithstanding the existence of any different or additional facts.

7.     Releasor agrees that this Release is confidential and agrees not to disclose (and none of Releasor's heirs, executors, administrators and assigns shall disclose) any information regarding the terms of this Release, except to any tax, legal or other counsel Releasor (or Releasor's heirs,

{02957587.DOC;1 }
24111080.4

18

executors, administrators and assigns, as applicable) has consulted regarding the meaning or effect hereof or as required by law, and Releasor will instruct each of the foregoing not to disclose the same to anyone.

8.     Whenever possible, each provision of this Release shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein. The remedies provided herein are cumulative and not exclusive of any remedies provided by applicable law.

9.     This Release shall be governed by and construed in accordance with the laws of the State of Pennsylvania that apply to contracts made and performed entirely within such state.

10.     BY SIGNING THIS RELEASE, RELEASOR REPRESENTS AND AGREES THAT RELEASOR:

(a)     HAS READ THIS RELEASE CAREFULLY;

(b)     UNDERSTANDS ALL OF ITS TERMS AND KNOWS THAT RELEASOR IS GIVING UP IMPORTANT RIGHTS;

(c)     VOLUNTARILY CONSENTS TO EVERYTHING IN IT;

(d)     HAS BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING THIS RELEASE AND HAS DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION THE UNDERSIGNED HAS CHOSEN NOT TO DO SO OF HIS OWN VOLITION;

(e)     HAS SIGNED THIS RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE THE UNDERSIGNED WITH RESPECT TO IT; AND

(f)     AGREES THAT THE PROVISIONS OF THIS RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF EMPLOYER AND BY THE UNDERSIGNED.

11.     In further consideration of the payments and benefits that Releasor will receive pursuant to Section 5.2 of the Employment Agreement, Releasor hereby irrevocably and unconditionally fully and forever waives, releases and discharges the Released Parties from any and all Claims, whether known or unknown, from the beginning of time to the date of the Releasor's execution of this Release arising under the Age Discrimination in Employment Act (ADEA), as amended, and its implementing regulations. Releasor agrees he is not entitled to be paid the payments and benefits under Section 5.2 of the Employment Agreement unless he signs this Release and does not revoke the release contained in this paragraph during the seven (7) day revocation period set forth below. By signing this Release, (i) Releasor hereby acknowledges and confirms

{02957587.DOC;1 }
24111080.4

19

that Releasor was given at least twenty-one (21) days to consider the terms of this Release and consult with an attorney of his choice, although he may sign it sooner if desired; (ii) Releasor understands that he has seven (7) days from the date he signs this Release to revoke the release in this paragraph by delivering notice of revocation via overnight delivery to the attention of Paragon Wholesale Foods Corp., 173 Thorn Hill Road, Warrendale, PA 15086, before the end of such seven-day period; and (iii) Releasor understands that the release contained in this paragraph does not apply to rights and claims that may arise after the date on which Releasor signs this Release.

Releasor has caused this Release to be executed as of the date first written above.

Patrick R. Viancourt

## Exhibit B

## Long-Term Incentive Plan

See attached.