**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PATRICK R. VIANCOURT                )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )        Civ. A. No. 20-628
                                    )        Judge Nora Barry Fischer
PARAGON WHOLESALE FOODS CORP.,      )
                                    )
                    Defendant.      )

## MEMORANDUM OPINION

I.    INTRODUCTION

In this case, Plaintiff Patrick R. Viancourt ("Viancourt" or "Plaintiff") brings claims for breach of contract and violations of the Pennsylvania Wage Payment and Collection Law ("WPCL") against his former employer, Defendant Paragon Wholesale Foods Corp., ("Defendant" or "Paragon").  (Docket No. 25).  Viancourt contends that Paragon breached his Employment Agreement ("Agreement")[1] by failing to pay him long-term incentive payments following his termination and further asserts that Paragon's actions violated the WPCL.  (Docket No. 101). Paragon counters that the plain language of the Agreement does not provide Viancourt the right to collect long-term compensation and that its actions in delaying certain severance payments to him were taken in good faith.  (Docket No. 97).

The parties have filed cross-motions for summary judgment as to Counts I-IV in Plaintiff's Amended Complaint[2] and the Magistrate Judge issued a Report and Recommendation ("R&R")

---

[1]     The Court notes that the Agreement is filed on the record in multiple places, including Docket Nos. 25-1; 99-24; 98-1 at 322-342.  For convenience, the Court will cite to it as "Agreement."

[2]     The parties advised that the declaratory judgment claim in Count V of Plaintiff's Amended Complaint has been resolved.  (Docket No. 101 at 2, n.1).

recommending that their motions be denied.  (Docket Nos. 96; 99; 121).  Presently before the Court are the parties' cross-objections to the R&R and their responses thereto.  (Docket Nos. 122; 123; 125; 126; 127).  After conducting a *de novo* review of the R&R, the parties' cross-motions for summary judgment, briefs, concise statements, appendices, objections and responses, and for the following reasons, the R&R [121] is adopted, in part and rejected, in part, Defendant's Motion for Summary Judgment [96] is granted, in part, and denied, in part, and Plaintiff's Motion for Summary Judgment [99] is granted, in part, and denied, in part.

II.      BACKGROUND[3]

    A.      *Initial Discussions of Plaintiff's Employment as President of Paragon*

        In November 2018, [Paragon] was searching for a candidate to fill the position of president.  ECF Nos. 98 & 115 ¶ 1.  At that time, Elaine Bellin ("Bellin"), Paragon's CEO, received a telephone call from a mutual friend of Bellin and [Viancourt], in which he recommended that Bellin speak to Viancourt about possibly filling this position.  *Id.* ¶ 2.  On November 19, 2018, Bellin called Viancourt, told him that she had received his name from a mutual friend, and indicated that she would like to talk to him about filling the position of president of her company, Paragon.  *Id.* ¶ 3.  Bellin approached Viancourt because of his experience in managing and operating companies, and because she believed he could be instrumental in helping her grow Paragon and position the company for sale within the next five years.  ECF Nos. 102 & 113 ¶ 7.  At the time he was contacted by Paragon, Plaintiff had several years of experience working in executive roles for multiple private equity firms and private equity-owned companies, which were successfully sold during Plaintiff's tenure.  *Id.* ¶ 8.  Viancourt and Bellin agreed to meet to become acquainted and to discuss the position. ECF Nos. 98 & 115 ¶ 5.

        Viancourt and Bellin met at Paragon's offices on November 29, 2018.  *Id.* ¶ 6.  The meeting was a general introductory meeting which did not include any discussion about the terms and conditions of employment or any compensation proposal.  *Id.* ¶ 7.  During the next few weeks, Viancourt and Bellin continued discussing the expectations of the role of president.  *Id.* ¶ 8.  On December 15,

---

[3]      The Court largely adopts the facts set forth in the R&R but also sets forth additional facts bearing on the resolution of this matter.  (*See* Docket No. 121).  The facts are generally uncontested, unless otherwise noted.

2018, Belin requested that Viancourt send her the compensation program Plaintiff had with his former employer, Hospitality Mints, along with his compensation proposal for Paragon.  *Id.* ¶ 9. Viancourt prepared a compensation proposal that described his compensation package with Hospitality Mints and his proposal for Paragon and submitted them to Bellin on December 16, 2018.  *Id.* ¶ 10.  Viancourt and Bellin met on December 21, 2018 during which they discussed his proposal.  *Id.* ¶ 11.  Viancourt's proposal included a long-term incentive plan […] that described his former plan with Hospitality Mints as well as what he was seeking from Paragon.  *Id.* ¶ 12.  Having a compensation package that included a [long-term incentive plan] was an important condition to Viancourt's willingness to work at Paragon.  ECF Nos. 102 & 113 ¶ 12.

On December 29, 2018, Bellin made a written offer of employment to Viancourt.  ECF Nos. 98 & 115 ¶ 28.  Bellin's offer included three components to his compensation: a base salary, a bonus structure, and a long-term compensation structure […].  *Id.* On January 2, 2019, Viancourt emailed Bellin his response to Paragon's proposed compensation terms.  ECF Nos. 102 & 113 ¶ 18.  With regard to the [long-term incentive plan] provision, Plaintiff indicated that he would need further details "to make sure we're both on the same page.  How is value defined?"  *Id.*

(Docket No. 121 at 2-3).

B. *Negotiations of Terms of Employment Agreement*

There were three drafts of the Agreement exchanged during negotiations and Viancourt utilized his attorney, Gregory O'Brien, Esq. and Bellin engaged Joseph McDonough, Esq. to represent Paragon. (*Id*. at 3).

Bellin testified that Viancourt was eager to begin his employment with Paragon, and Bellin was eager for him to get started.  Bellin Dep., ECF No. 98-1 at 71, 104, 182.  She further testified that she had a difficult time reaching her counsel, Attorney McDonough, and that the negotiations were "just very, very rushed."  *Id.* at 100-02, 182.

The first draft of the agreement was prepared by O'Brien on behalf of Viancourt and circulated by Vianourt to Bellin for comment on January 7, 2019 attached to the following email:

Hell[o] Elaine,

3

> Attached is the draft of the employment agreement.  Two things to note:
>
> 1. Upon further review, I will not be deferring any of my 2019 comp since based on our last conversation, PF does not have a formal DC program in place.
>
> 2. While the details of the LTC are listed in the agreement, there most likely will need to be a shareholders agreement put together by your outside financial/legal counsel.
>
> Feel free to call with any questions. […]
>
> Regards,
>
> Pat

(Docket No. 98-2 at 92).  Section 3.3 of this version provided:

> 3.3    Long-Term Incentive Plan.  During the Employment Period, Employee shall be eligible to participate in a long-term incentive payment in accordance with the Plan as set forth in the attached Exhibit B and as modified time to time in the future by mutual written agreement between the Employer and Employee.  All payments under the Plan will be subject to applicable withholding requirements. **[Need to discuss and draft with the parties a "Stock Appreciation Rights Plan" for Exhibit B to incorporate discussion items which were generally the following:**

| Months of Employment | % of Value Creation | % of Value Creation Vested |
|---|---|---|
| 0-24 | 3% | 0- 12 months = 1.5%, 12+ months = 3.0% |
| 25-48 | 5% | 24+ months = 4.0%, 36+ months = 5.0% |
| 49-60 | 10% | 48+ months = 10% |
| 61+ | 15% | 60+ months = 15% |

> **\*Baseline for Value Creation will be measured off of 2018 financials and company value. Reserve the right to trigger, in whole or part, vested equity payouts after 72 months from Effective Date if change of control has not occurred.  This also accounts for upside of the value creation on strategic value, not appreciation value. If earnings results are ahead of plan consistent with the next time bound threshold, the % payout jumps to that next threshold. Except for Cause, would receive the vested % of value creation up to the date of termination].**

(*Id*. at 97).  The initial draft of the Employment Agreement prepared by O'Brien on behalf of

Plaintiff contains two appendices, Exhibits A and B.  The first page of Exhibit A is a cover sheet:

**Exhibit A**

**Release and Waiver of Claims**

See attached.

(*Id*. at 107).  The attachment to Exhibit A is a 4-page document titled "Waiver and Release of Claims," which was drafted by O'Brien, and the terms of which were never altered during the negotiations.  (*Id*. at 108-111).  On the other hand, Exhibit B to this initial draft of the Employment Agreement consisted only of the following cover sheet:

**Exhibit B**

**Long-Term Incentive Plan**

See attached.

(*Id*. at 112).  It is uncontested that the parties never produced a separate "Long-Term Incentive Plan" or a "Stock Appreciation Rights Plan" to attach as part of Exhibit B at any time including during their negotiations or the employment relationship between Viancourt and Paragon. (Docket No. 121 at 12).

Bellin shared this first draft of the employment agreement with her counsel, McDonough, and she later communicated Paragon's comments and proposed changes to Viancourt via email. Viancourt provided those comments to his attorney, O'Brien, who drafted a second version of the agreement incorporating the company's suggested changes.    (Docket No. 98-2 at 121-140). Section 3.3 of the second version stated:

3.3    Long-Term Incentive Plan.  During the Employment Period, Employee shall be eligible to participate in a long-term incentive payment in accordance with the Plan as set forth in the attached Exhibit B and as modified time to time in the future by mutual written agreement between the Employer and Employee.  All payments under the Plan will be subject to applicable withholding requirements. [Need to discuss and draft with the parties a In drafting the "Stock Appreciation Rights Plan" for Exhibit B to incorporate discussion items which were that will become Exhibit B, Employer and Employee agree that it shall including but is not limited to generally the following:

| Months of Employment / % of Value Creation | | % of Value Creation /Vested |
|---|---|---|
| 0-24 | 3% | 0- 12 months = 1.5%, 12+ months = 3.0% |
| 25-48 | 5% | 24+ months = 4.0%, 36+ months = 5.0% |
| 49-60 | 10% | 48+ months = 10% |
| 61+ | 15% | 60+ months = 15% |

*Baseline for Value Creation will be measured off of 2018 financials and company value. Reserve the Baseline for value creation to the Employer from the Effective Date off of 2018 financials and company value. Employee's right to trigger, in whole or part, vested equity payouts after 72 months from Effective Date if change of control (as generally defined by federal tax law) has not occurred, or in the event of termination as expressly set forth in Section 5.2.  This also accounts for upside of the value creation on strategic value, not appreciation value. If earnings results are ahead of plan consistent with the next time bound threshold, the % payout jumps to that next threshold.  Except for Cause, would receive the vested % of value creation up to the date of

(*Id.* at 125).  Bellin admitted at her deposition that the underlined language (which is also set forth in blue) in this second version of the agreement was incorporated at the request of Paragon. (Docket No. 108-1 at ¶ 27).

Bellin and McDonough corresponded about the language contained in this second version of the Agreement.  Paragon ultimately proposed additional changes to Section 3.3., as follows:

3.3    Long-Term Incentive Plan.  During the Employment Period, Employee shall be eligible to participate in a long-term incentive payment in accordance with the Plan as set forth in the attached Exhibit B and as modified time to time in the future by mutual written agreement between the Employer and Employee.  All payments under the Plan will be subject to applicable withholding requirements. In drafting the "Stock Appreciation Rights Plan" that will become Exhibit B, Employer and Employee agree that it shall including but is not limited to to be attached hereto as Exhibit B, Employer and Employee agree that it shall include, but not be limited to, generally the following:

Bellin then forwarded this third version of the agreement to Viancourt on January 14, 2019. (Docket No. 108-1 at ¶ 34).

C.      *Terms and Conditions of Final Agreement*

Viancourt and Paragon entered into the final version of the Agreement effective January 28, 2019.  *See Agreement* at 1.  The Agreement contains several provisions which the parties agreed are relevant to its interpretation and construction.  *Id*.  To that end, § 1 titled "Definitions," states that "[f]or purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1," including:

> *"Agreement"* – means this Employment Agreement, including any Exhibits hereto, as amended from time to time.
>
> ...
>
> *"Compensation"* – means the Salary and benefits described in Section 3.
>
> ...
>
> *"Employment Period"* – means the period of time during which Employee is employed by Employer.
>
> *"Plan"* – means the Long-Term Incentive Plan entered into between Employer and Employee.
>
> *"Release and Waiver of Claims"* – means a written release and waiver by Employee in the form attached as Exhibit A hereto.

(*Agreement* at § 1).  The parties also used the typical convention throughout their Agreement that important words and phrases are highlighted through use of quotations and initial capitalization, including, among others, "Employee," "Employer," "Salary," "Signing Bonus," "Benefits Plans," "Annual Performance Bonus," "Sections," and "Stock Appreciation Rights Plan."  (*Id*. at 1, §§ 3.1(a), 3.1(b), 3.1(c), 3.2, 3.3, 8.10).

A choice of law clause is found in Section 8.9:

> 8.9 Governing Law, Venue and Jurisdiction:  This Agreement shall be governed by and construed under Pennsylvania law, without regard to conflict of laws principles.  […]

(*Id*. at § 8.9).  The parties then adopted several rules of construction in § 8.10:

> 8.10 <u>Section Headings: Construction</u>.  The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation.  All references to "Section" or "Sections" shall refer to the corresponding Section or Sections of this Agreement unless otherwise specified.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Unless otherwise expressly provided, the word, "including" does not limit the preceding words or terms.

(*Id.* at ¶ 8.5).  Another provision at § 8.5 sets forth the parties' stipulation that "[t]he rights and remedies of the parties to this Agreement are cumulative and not alternative."  (*Id.* at § 8.5).  The parties also included integration and severability clauses:

> 8.8  <u>Entire Agreement: Amendments</u>:  This Agreement, as it may be amended from time to time, contains the entire agreement between the parties with respect to the subject matter hereof and other agreements or understandings, oral or written, between the parties hereto with respect to the subject matter hereof.  This Agreement may not be amended orally, but only by an agreement in writing signed by the parties hereto.
>
> …
>
> 8.11 <u>Severability</u>.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part of degree will remain in full force and effect to the extent not held invalid or unenforceable.

(*Id.* at §§ 8.8, 8.11).

The language of the provisions in dispute, §§ 3.3 and 5.2, are as follows:

> 3.3   <u>Long-Term Incentive Plan</u>. During the Employment Period, Employee shall be eligible to participate in a long-term incentive payment in accordance with the Plan as set forth in the attached <u>Exhibit B</u> and as modified time to time in the future by mutual written agreement between the Employer and Employee. All payments under the Plan will be subject to applicable withholding requirements. In drafting the "Stock Appreciation Rights Plan" to be attached hereto as Exhibit B, Employer and Employee agree that it shall include, but not be limited to, the following:

| Months of Employment/% of Value Creation | | % of Value Creation/Vested |
|---|---|---|
| 0-24 | 3% | 0-12 months =1.5%, 12+ months = 3.0% |
| 25-48 | 5% | 24+ months = 4.0%, 36+ months = 5.0% |
| 49-60 | 10% | 48+ months = 10% |
| 61+ | 15% | 60+ months =15% |

> Baseline for value creation to the Employer from the Effective Date off of 2018 financials and company value. Employee's right to trigger, in whole or part, vested equity payouts after 72 months from Effective Date if change of control (as generally defined by federal tax law) has not occurred, or in the event of termination as expressly set forth in Section 5.2.  This also accounts for upside of the value creation on strategic value, not appreciation value. If earnings results are ahead of plan consistent with the next time bound threshold, the % payout jumps to that next threshold. Except for Cause, would receive the vested % of value creation up to the date of termination.

(*Id*. at § 3.3).  Section 5.2 of the Agreement governs "Termination Pay" and states, in relevant part, as follows:

> Effective upon the termination of the Employment Period but subject to the terms and conditions hereof, Employer will be obligated to pay Employee . . . only such compensation as is provided in this Section 5.2. . . . Notwithstanding any other provision of this Section 5.2 or this Agreement to the contrary, Employer will begin to pay the amounts provided in Sections 5.2(a) through 5.2(c), . . .  no later than Forty-Five (45) days following the termination of the Employment Period, but only if by such 45th day (i) Employee . . . executes and delivers to Employer a Release and Waiver of Claims and (ii) and any revocation period provided under applicable law has expired without Employee's revocation of the Release and Waiver of Claims. Additionally, Employee will forfeit all amounts owed under this Section 5.2 unless Employee is and continues to be in compliance with the terms of Sections 6 and 7 of this Agreement.

(*Id*. at § 5.2).  Section 5.2 (c) concerns termination, without cause:

> If Employer terminates Employee's employment without Cause then [...] (iv) pay Employee any payments owed to Employee as of the termination of the Employment Period under the Plan as set forth in Section 3.3; provided, however, that upon any breach by Employee

of the terms or agreements set forth in Section 6 or Section 7 of this Agreement, Employer's obligation to make such payments shall immediately terminate; Employer shall not be required to commence performance of its obligations under Subsection 5.2(c) (other than the Accrued Obligations) until the regular payroll practice immediately following Employee executing and delivering to Employer the Release and does not revoke the Release.

(*Id*. at § 5.2(c)).

> D.   *Relevant Events During Viancourt's Employment at Paragon*

Before and after Plaintiff commenced his employment at Paragon, Plaintiff and Bellin discussed obtaining a valuation of the company [as referenced in Section 3.3].   ECF Nos. 102 & 113 ¶ 50. In early May of 2019, Paragon retained the accounting firm of Grossman Yanak & Ford ("GYF") to perform a valuation of Paragon.   According to the Report generated by GYF, the valuation was "to render an opinion as to the fair market value of a one percent equity ownership interest, on a non-controlling, nonmarketable basis in Paragon as of December, 2018."   ECF Nos. 113 & 120 ¶ 51.

The valuation report further states that GYF's conclusion "will be utilized by management of the Company in conjunction with certain corporate planning strategies, including the implementation of a Stock Appreciation Rights ('SARs') incentive plan" and suggests that it "should not be used for any purpose other than that set forth in the preceding paragraph."   ECF Nos. 102, 113 & 120 ¶ 51.   Following Paragon's engagement of GYF, Bellin and Viancourt often discussed the valuation and were the two Paragon employees who supplied the materials GYF relied upon in completing its valuation.   ECF Nos. 102 & 113 ¶¶ 53 &54.   Paragon provided GYF with twenty-one internal documents for its use in conducting its valuation.   These documents included, among other things, Paragon's financials and a copy of Viancourt's Employment Agreement.   ECF Nos. 102, 113 & 120 ¶ 56.   GYF set fair market value of the equity at $44,700,000, on a controlling, marketable basis.   Using this figure GYF opined that the fair market value of a one percent, nonmarketable, equity ownership in Paragon was $314,000.   *Id.* ¶ 58.   Upon receiving GYF's valuation report in September of 2019, Bellin shared a copy with Plaintiff. ECF Nos. 102 &113 ¶ 59.

(Docket No. 121 at 5-6).   The GYF report noted that the only shareholders in Paragon included:

Bellin, (364 shares); her father, William, (100 shares), and trust funds established for her two

children, (118 shares each).  (Docket No. 108-4 at 16).  Viancourt admits that he has never owned

any shares of Paragon.  The company did well financially during Viancourt's brief tenure as

president.

> [Indeed,] Paragon had the best financial performance in the
> company's history in 2019, and as of November 2019, Paragon's
> financial performance substantially exceeded the numbers
> forecasted for 2019 in GYF's valuation. ECF Nos. 102, 113 & 120
> ¶¶ 61-62.   Paragon disputes any implication that Plaintiff
> contributed to Paragon's 2019 financial performance.  *Id.* ¶ 61.
> Bellin testified that, as Paragon's President, Plaintiff "brought nice
> structure to the organization," "conducted meetings on a regular
> basis," contributed "corporate experience" and "routine," and
> brought "discipline" to Paragon and the company's pricing
> strategies.  ECF Nos. 102 & 113 ¶ 65.  Plaintiff substantially
> fulfilled all terms and conditions of the Employment Agreement, he
> was never reprimanded, and he did not receive any negative reviews
> from Bellin or Paragon during his employment as the company's
> President. *Id.* ¶ 66.

E.    *Plaintiff's Termination; Severance Negotiations; Execution of Release*

"On November 29, 2019, Paragon terminated Plaintiff effective immediately and without

cause."  (Docket No. 121 at 6).  Over the next week, Bellin and Viancourt engaged in negotiations

to resolve any disputes surrounding his severance and separation from the company which are set

forth in their email correspondence.  (Docket No. 98-3 at 15-20).  Although their competing

proposals were not that far apart, and Paragon had offered to pay Viancourt a lump sum of

$406,427 in January of 2020 and provide him a mutually agreed upon letter of recommendation,

among other things, the parties reached an impasse.  (*Id.* at 17).  On December 7, 2019, Viancourt

advised Bellin that after consulting with his counsel, he was rejecting Paragon's final offer and

forwarded a copy of the fully executed release.  (*Id.*).

The Release states that "[a]s a condition to receipt of certain payments from [Paragon]

under Section 5.2 of the Employment Agreement, [Viancourt] has agreed to execute and deliver

this Release." *Agreement*, Ex. A at 2.  This document includes broad language releasing any and all claims arising out of Viancourt's employment but states that the waiver is limited to "Federal, state or local law (statutory, regulatory or otherwise) that may be legally waived and released." *Id*. at ¶¶ 1, 3. Viancourt concurred that any payments due to him under § 5.2 of the Agreement were expressly conditioned on his execution of the Release and his waivers of any and all claims and that those payments were sufficient consideration to support the Release.  *Id*.  He further stipulated that if he violated the Release by suing Paragon, that the Release would be a full defense to the claims and that he would pay Paragon "all reasonable costs and expenses of defending against the suit incurred by [Paragon.]"  *Id*. at ¶ 5.  The Release also indicated that Viancourt had fully read the agreement, consulted with his counsel, and knowingly and voluntarily agreed to all of its terms.  *Id*. at ¶ 10.

Approximately one week later, on December 13, 2019, Bellin followed up with an email to Viancourt which contained yet another offer to resolve the ongoing severance dispute.  (Docket No. 98-3 at 16).  She wrote that:

> This will acknowledge my agreement that Paragon terminated your employment effective November 29, 2019. Pursuant to your Employment Agreement, Paragon exercised its' (sic) right to accelerate the effective date of your termination to that date. I also acknowledge receipt of your signed Release and Waiver of Claims. As a result, your will receive salary continuation, on Paragon's normal payroll schedule, through November 28, 2020. In addition, you are entitled to receive a pro-rated annual bonus in the amount of $173,734.16 payable on or before April 15, 2020. In consideration of your agreement that no further payments are due to you under your Employment Agreement and/or the Release and Waiver of Claims, I am willing to accelerate this bonus payment into the first month of 2020. Please let me know if you are interested in this accelerated bonus arrangement.
>
> In addition, you remain in possession of proprietary Paragon documents and Paragon computer equipment. Your employment agreement required that you return these items to Paragon

12

> immediately. While you are required to return these items in any
> event, doing so is further condition of Paragon's willingness to
> accelerate your bonus payment.

(*Id*. at 16).  Under this offer, Paragon agreed to pay Viancourt a total of $465,734.16, with the full

salary continuation payment of $292,000 payable in two week increments over the next 12 months

and the pro-rated bonus of $173,734.16 payable by January 31, 2020 if Viancourt returned all

company property and stipulated that no other payments were due under the Agreement.  (*Id*.).

Viancourt did not accept but made another counteroffer.

> I am writing with regard to your proposal. As per my employment
> agreement, an LTIP payment (if terminated without cause) was
> guaranteed in year 1 based upon a percentage of value creation as
> established at the end of 2018. I realize to ascertain the LTIP the
> company would have to engage professionals to determine the exact
> value of the LTIP. In lieu of pursuing that valuation to determine
> this LTIP payment and any other claims under the employment
> agreement, I will agree to the terms that you have presented below
> provided that I receive twelve months of medical coverage
> continuation at no cost ($1,500/month or $18,000 total), and a
> positive reference from you for future potential employers with
> mutually agreeable language, including but not limited to, that I was
> originally hired to prepare Paragon for sale, that I achieved agreed
> upon goals toward that anticipated sale, but you chose not to pursue
> a sale.

(*Id*. at 15-16).  Bellin responded stating "Pat - Your counterproposal is rejected.   We will proceed

with the terms of the agreement."  (*Id*. at 15).

    F.    *Severance Payments & Delays*

Since their negotiations failed, Paragon commenced making salary continuation payments

to Viancourt on December 20, 2019 and did so every two weeks through March 13, 2020.  (Docket

No. 121 at 7).

> Effective March 16, 2020, the Governor of Pennsylvania ordered
> that all restaurants and bars in five Pennsylvania counties, including
> Allegheny County, must close their dine-in-facilities due to the
> COVID-19 pandemic.  The next day, March 17, 2020, Bellin left

> Plaintiff a voice message in which she alluded to the fact that
> Paragon would not have the funds to pay Plaintiff going forward.
> ECF Nos. 102 & 113 ¶¶ 92-93.  Paragon received a PPP loan for
> over $2.3 million on April 4, 2020.  Plaintiff states that Paragon's
> receipt of the PPP loan during the same period it was claiming it
> could not afford to pay Plaintiff's compensation is directly relevant
> to Plaintiff's claims for liquidated damages and other relief under
> Pennsylvania's Wage Payment Collection Law.  ECF Nos. 102, 113
> & 120 ¶ 96.

(*Id*. at 7-8).  Paragon did not pay the next seven (7) salary continuation payments which were due

to Viancourt between March 27, 2020 and June 19, 2020 nor the annual performance bonus which

was due on April 15, 2020.  (*Id*.).

> On July 3, 2020, Paragon resumed making its Salary Continuation
> payments to Plaintiff every two weeks.  On July 31, 2020, Paragon
> paid Plaintiff the seven Salary Continuation payments, which were
> required to be paid every two weeks from March 27, 2020 to June
> 19, 2020. Also on July 31, 2020, Paragon paid Plaintiff his Annual
> Performance Bonus. ECF Nos. 102 & 113 ¶¶ 97100.  To date,
> Paragon has refused to pay Viancourt any [long-term incentive
> payment] compensation because the parties dispute whether it is due
> pursuant to Section 3.3 of the Employment Agreement.  ECF Nos.
> 102 & 113 ¶ 101.

(*Id*. at 8). Viancourt admits that Paragon made all salary and salary continuation payments which

he was owed under the Agreement by December of 2020.  (Docket No. 114 at 28).

### G.  *Plaintiff's Lawsuit & Answer of Defendant*

Viancourt initiated these proceedings by filing a two-count complaint for breach of contract

and unjust enrichment on April 28, 2020.  (Docket No. 1).  He asserted that he was due a total of

$492,578.77 in unpaid severance, consisting of: $213,844.61 in salary continuation payments;

$173,734.16 in a pro-rata Annual Performance Bonus; and $105,000 in a long-term incentive

payment, along with pre-judgment interest and costs of collection.  (*Id*.).   Shortly thereafter, the

parties stipulated to the dismissal of the unjust enrichment claim.  (Docket Nos. 13; 14).  Paragon

submitted its Answer on June 26, 2020 at which time the company admitted that it was "in breach

of the obligation to pay the periodic salary payments due for the period of March 13 through present, and the pro rata portion of the bonus" but denied that any long-term incentive payment was due. (Docket No. 15). Paragon further asserted that Viancourt could not recover for salary continuation payments which were not yet due under the terms of their agreement and raised the affirmative defense of commercial impracticability given its alleged financial issues caused by the COVID-19 pandemic. (*Id*.).

  H. *Settlement Discussions; Rule 16 Proceedings & Paragon's Payment of Outstanding Wages*

  The correspondence between the lawyers during the summer of 2020 reveals that the parties engaged in some settlement discussions around that time. (Docket No. 98-4). To that end, Paragon initially proposed that it pay the gross amount of the pro-rata annual performance bonus ($173,734.16) and all of the remaining salary continuation payments ($202,153.86) in 60 equal biweekly payments of $6,264.80 starting on July 3, 2020. (Docket No. 98-4 at 16-17). Viancourt rejected this offer through his counsel and countered that he should be paid a lump sum of the gross amount of outstanding bonus and salary continuation payments ($252,349.54) and that the remaining salary continuation payments and disputed long-term incentive payment should be paid in 26 biweekly payments starting on July 3, 2020. (*Id*. at 15). He also asked for eight percent (8%) interest on the lump sum for the outstanding payments. (*Id*.). Paragon's counsel responded that Viancourt's counterproposal was "disappointing," including the request for eight percent (8%) interest and that there was "[n]ot really anything to work with here" but that he would see if his client wanted to respond. (*Id*. at 14). With that said, it is uncontested that Paragon commenced making biweekly salary continuation payments to Viancourt on July 3, 2020.

  In preparation for the Rule 16 initial case management conference, counsel for the parties submitted a Rule 26(f) Report on July 14, 2020. (Docket No. 18). The attorneys advised in this

joint filing that they were interested in participating in a judicial settlement conference and/or a

mediation and generally believed that an early resolution could be reached.  (*Id*.). They noted that

there were some outstanding disputes concerning whether the December 6, 2019 payment

constituted a salary payment for Viancourt's work completed through November 29, 2019 or a

salary continuation payment under their Agreement and whether there was any obligation of

Paragon to pay him a long term incentive payment.  (*Id*.). They also explained that Paragon

intended to pay the outstanding amounts due to Viancourt in the coming weeks which would

narrow their disputes.  (*Id*.).  Specifically, counsel stated the following on Viancourt's behalf:

> **6. Designate the specific Alternative Dispute Resolution (ADR) process the parties have discussed and selected, if any, and specify the anticipated time frame for completion of the ADR process. Set forth any other information the parties wish to communicate to the court regarding the ADR designation:**
>
> …
>
> **Plaintiff responds to no. 6 as follows:**
>
> …
>
> Defendant has informed Plaintiff's counsel that it intends to soon pay Plaintiff the full amount of his outstanding Annual Performance Bonus ($173,734.16) as well as the outstanding balance of the Salary continuation payments that Defendant ceased paying on or about March 13, 2020.  Effective July 2, 2020, Defendant resumed its Salary continuation payments to Plaintiff and Defendant has pledged to continue these payments under the terms of the Agreement. If Defendant follows through on these commitments, the remaining amount in controversy, exclusive of interest for all past due payments, is estimated to be about $116,000.
>
> …
>
> **16. Set forth whether the parties have considered the possibility of settlement of the action and describe briefly the nature of that consideration:**
>
> …

**Plaintiff responds to no. 16 as follows:**

Assuming that Defendant fulfills its commitment to pay Plaintiff the full amount of his outstanding Annual Performance Bonus ($173,734.16), as well as the outstanding balance of the Salary continuation payments that Defendant ceased paying on or about March 13, 2020, Plaintiff submits that three issues remain in dispute: (1) whether a payroll disbursement made to the Plaintiff on Friday, December 6, 2019, for the pay period ending on Friday, November 29, 2019, the date of Plaintiff's termination, was a regular payment of salary; (2) the amount of the long-term incentive plan payment due to Plaintiff under the parties' Agreement; and (3) the amount of interest Plaintiff is entitled to. Exclusive of interest, the amount in controversy is approximately $116,000, which weighs in favor of attempting to resolve this matter at an early stage.

(Docket No. 18). The Rule 26(f) Report is executed by counsel for both parties. (*Id.*). The minute entry from the Rule 16 conference similarly states that "[i]t is Defendant's intent to pay Plaintiff both the salary continuation obligations and his pro rata share of his annual bonus. The issue remaining is the long-term incentive plan. Defendant states that none was ever agreed to as to the referred to exhibit regarding this is blank. Plaintiff of course disagrees." (Docket No. 20). Defendant requested an opportunity to file a motion for judgment on the pleadings and a briefing schedule was issued. (*Id.*). A case management order was also entered and included a deadline for amended pleadings to be filed by August 28, 2020. (Docket No. 21).

Approximately one week later, on July 21, 2020, defense counsel wrote the following to Viancourt's counsel:

We have calculated the amounts that we are going to tender for the missed salary continuation payments and the unpaid pro rata bonus. We will provide you with that calculation, together with the breakdown of deductions [for] payroll that we will be applying to the gross amounts. We will actually make three separate payments: (1) a payment for the principal amount of the unpaid salary payments; (2) a payment of the principal amount of the bonus; and (3) a payment covering the total, aggregate interest. The immediate question is the mechanics of the payments. At least to the principal payments of salary and bonus, it would be simplest for us to utilize

17

> the direct deposit mechanism, as Paragon has resumed utilizing for
> the salary payments.  Do you see any reason not to do it that way?  I
> will have to see if the company can make a direct deposit of the
> interest.  That might have to be made by check.

(Docket No. 98-4 at 6).  Viancourt's counsel responded "I agree it makes sense to make all three payments via direct deposit, as Paragon has done for the salary payments.  Please move forward with doing so.  If Paragon cannot pay the interest via direct deposit, we can accept payment of the interest by check.  Is there a date on which Paragon expects to make the deposits?"  (*Id*. at 5).  Paragon's counsel followed up a few hours later:

> Having preliminarily discussed this with the financial people, it
> looks like the net salary and bonus amount can be direct deposited,
> and they plan to facilitate that on the next regular pay day which is
> July 31.  I'll get confirmation of the deposit, but [your] client should
> look for it that day.  We'll calculate interest on the principal amounts
> through that date and issue a separate check for all accrued interest,
> for which the company will issue a 1099.  Since the interest payment
> is not time sensitive (because interest is not recoverable on interest)
> we'll get that to you in due course.

(*Id*. at 5).  Defense counsel forwarded the interest calculations based on six percent (6%) interest which were then approved by Plaintiff's counsel.  (*Id*. at 7).  Paragon made the outstanding bonus and salary continuation payments to Viancourt through a direct deposit on July 31, 2020 and sent him a separate check of $2,905.49 for the interest.  (*Id*. at 8-14).

Paragon separately submitted its motion for judgment on the pleadings and brief in support on July 30, 2020.  (Docket Nos. 22; 23; 25).  In response, Viancourt filed his five-count Amended Complaint on August 13, 2020, including one count for breach of contract due to the alleged failure to pay the long-term incentive payment (Count I) and added three counts asserting violations of the WPCL (Counts II-IV).  (Docket No. 25). Viancourt limited his breach of contract claim to seeking recovery of approximately $105,000 due to Paragon's alleged failure to pay him a long-term incentive payment and dropped his claims for the unpaid annual performance bonus and the

unpaid salary continuation payments which had been satisfied before the amended pleading was filed.  (Docket No. 25 at ¶¶ 45-51).  His WPCL claims are as follows:

- Count II asserts that Paragon improperly designated the payment on December 6, 2019 as a salary continuation payment rather than payment for his salary earned through his termination on November 29, 2019 and seeks $11,230.77 in unpaid salary, 25% liquidated damages, plus pre-judgment and post-judgment interest, and attorneys' fees and costs;

- Count III seeks recovery of approximately $105,000 for the non-payment of the long-term incentive payment, 25% liquidated damages, plus pre-judgment and post-judgment interest and attorneys' fees and costs; and,

- Count IV seeks 25% liquidated damages for the untimely payment of the Annual Performance Bonus plus pre-judgment and post-judgment interest and attorneys' fees and costs.

I.     *Report and Recommendation on Judgment on the Pleadings; Adoption by Court; Paragon's Answer*

Paragon renewed its motion for judgment on the pleadings on September 2, 2020 arguing that Count I alleging breach of contract for the failure to make a long-term incentive payment to Viancourt should be dismissed and the motion was fully briefed by the parties.  (Docket Nos. 33; 35; 36; 38; 41; 42).  The Magistrate Judge issued a Report and Recommendation on December 6, 2020 recommending that Paragon's motion be denied.   (Docket No. 43).  No objections were lodged and the Court entered an order adopting same as the Opinion of the Court and denying Paragon's motion.  (Docket No. 45).  Relevant here, the Report and Recommendation noted that the Employment Agreement contained an ambiguity due to the non-attachment of Exhibit B and found that discovery may reveal evidence which could be admissible to resolve the ambiguity such that the motion for judgment on the pleadings must be denied at that early stage of the case. (Docket No. 43).  The ambiguity surrounding Exhibit B is discussed in the following passages:

> the Employment Agreement is silent on what will happen if "the Plan as set forth in Exhibit B" is not set forth in Exhibit B. Defendant appears to maintain that any obligations pursuant to the Plan are contingent on its creation and attachment, while Plaintiff argues that even absent any attachment the Employment Agreement contains terms sufficient to form an enforceable contract. The truth may be somewhere in the middle. The wording of § 3.3 and § 5.2(c)(iv) fails to contemplate the nonexistence of Exhibit B at all and reads as if the creation and attachment of the "plan" is a foregone conclusion—and yet, here we are. Therefore, a plain reading of the Employment Agreement yields a latent but nonetheless clear ambiguity as to how it will operate in the event of Exhibit B's non-attachment.

(Docket No. 43 at 7-8).  In conclusion, the Report and Recommendation states that:

> [t]he language of the Employment Agreement, taken together with Exhibit B's absence, yields a definite ambiguity. Given that ambiguity, parol evidence as well as evidence of the parties' course of performance will be necessary to determine if Plaintiff is owed any compensation pursuant to an LTIP as alleged in Count 1 of the First Amended Complaint.

(*Id*. at 13).

Paragon filed its Answer to the Amended Complaint on January 5, 2021.  (Docket No. 47). While Paragon admitted that it was in breach of the Employment Agreement for a time, it had cured any breach as of this filing by paying Viancourt the entire bonus and all salary continuation payments. (*Id*.).  Paragon denied that any long-term incentive payment was due and raised a number of affirmative defenses, including that it could not be liable under the WPCL since the payments were made; that the WPCL claims were barred by defenses of accord, satisfaction and settlement; and that commercial impracticability prevented timely payments.  (*Id*.).  Another case management order was issued and an extended deadline for amended pleadings was set for February 11, 2021. (Docket No. 50).

     *J.*     *R&R on Cross-Motions for Summary Judgment*

After completing fact discovery, the parties submitted cross-motions for summary judgment arguing that they were entitled to judgment as a matter of law on each of Counts I-IV. (Docket Nos. 96-102; 108; 111-116; 118-120).  The motions were fully briefed, and the Magistrate Judge issued the R&R on February 15, 2023 recommending that both motions be denied.  (Docket No. 121).   On the breach of contract count, the R&R notes that "the parties agreed that 'the Plan' which was to be attached to the Agreement, as Exhibit B, was never created, they vehemently dispute the meaning and relevance of various words and phrases of Section 3.3."  (*Id* at 12).  The R&R lists a series of disputes between the parties concerning the language of Section 3.3 and points to ambiguities in the language contained in the final 4 sentences of the provision including the inserted Table.  (*Id*.).

The R&R concludes that the ambiguous language must be interpreted by the factfinder because both parties had proffered reasonable interpretations of the disputed terms which precluded the entry of summary judgment in favor of either party.  (*Id*. at 15).  As to the WPCL counts, the R&R recognized that there were no cases directly on point but found that Paragon had presented sufficient evidence to create a genuine issue of material fact on its good faith defense that the payments were withheld because the company was unable to pay due to the COVID-19 pandemic.  (*Id*. at 17-18.).   Hence, summary judgment was denied as to all three WPCL counts. (*Id*. at 18).

K.    *Parties' Objections*

Both parties filed objections to the R&R on March 1, 2023 and responses thereto on March 8, 2023.  (Docket Nos. 122; 123; 125; 126; 127).  In his objections, Viancourt argues that the Magistrate Judge erred by determining that Paragon presented sufficient evidence to support its defense to the WPCL claims and cites caselaw indicating that an employer's financial inability to

pay is not relevant to raising a good faith dispute justifying non-payment of wages to an employee. (Docket No. 123).  Paragon sets forth six separate objections to the Magistrate Judge's rulings on the breach of contract and WPCL counts.  (Docket No. 122).  The first four objections challenge the Magistrate Judge's determinations that alleged ambiguities in § 3.3 preclude summary judgment and the final one argues that Paragon is entitled to summary judgment because Viancourt has failed to prove that Paragon's value increased nor that he contributed to any such increase in value.  (*Id.*).  The remaining objection notes that the Magistrate Judge did not consider its position that the breach of contract claims as to the bonus and salary continuation payments settled prior to Viancourt bringing any claims under the WPCL.  (*Id.*).

The parties have not requested any further briefing or argument and the Court considers the matter to be fully briefed and ripe for disposition.

III.   LEGAL STANDARDS

The Federal Magistrate Judges Act governs the Court's review of a Report and Recommendation:

> When objections are filed to a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also United States v. Raddatz*, 447 U.S. 667, 674-75, 100 S. Ct. 2406, 65 L.Ed.2d 424 (1980) (explaining the standard for a district court's review of a magistrate judge's report and recommendation). The district court may accept, reject or modify—in whole or in part—the magistrate judge's findings or recommendations. § 636(b)(1)(C). Although the standard of review is *de novo*, § 636(b)(1) permits whatever reliance the district court, in the exercise of sound discretion, chooses to place on a magistrate judge's proposed findings and recommendations. *Raddatz*, 447 U.S. at 676, 100 S. Ct. 2406; *see also Goney v. Clark*, 749 F.2d 5, 7 (3d Cir. 1984) (noting the discretion district courts have in their use of magistrate judges' reports).

22

*Hill v. Barnacle*, 509 F. Supp. 3d 380, 385 (W.D. Pa. 2020) (quoting *Bonasorte v. City of Pittsburgh*, Civ. A. No. 18-0243, 2019 WL 1593720, at *1 (W.D. Pa. Apr. 15, 2019)) (further citations omitted).

Summary Judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (citations omitted). Further, "[a] dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Clews v. County of Schuylkill*, 12 F.4th 353, 358 (3d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "When confronted with cross-motions for summary judgment, the 'court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Anderson v. Franklin Institute*, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (quoting *Schlegel v. Life Ins. Co. of N. America*, 269 F. Supp. 2d 612, 615 n. 1 (E.D. Pa. 2003)); Charles A. Wright, Arthur R. Miller et al., 10A Fed. Prac. and Proc. § 2720 (3d ed. 1998).

A party seeking summary judgment "must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Conboy v. U.S. Small Bus. Admin.*, 992 F.3d 153, 160 (3d Cir. 2021) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party meets

its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings." *Conboy*, 992 F.3d at 160; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In this regard, the non-movant must come forward with more than "some metaphysical doubt as to the material facts." *Conboy*, 992 F.3d at 160; *see also Matsushita*, 475 U.S. at 586-87.

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, deposition testimony, admissions, and/or answers to interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

IV.     DISCUSSION

Presently before the Court are the parties' dueling objections to the R&R recommending that the Court deny their summary judgment motions.  (Docket Nos. 121-123; 125-127).  Paragon asks that the Court set aside the R&R and enter summary judgment in its favor on all counts in the Amended Complaint while Viancourt asks that the Court vacate only the portion of the R&R finding that disputes of fact preclude the entry of summary judgment on the WPCL claims. (Docket Nos. 122-123; 125-127).  Having conducted a *de novo* review in light of the standard governing summary judgment motions, the Court will set aside the R&R's discussion and enter summary judgment in favor of Paragon on Counts I, II, and III and in favor of Viancourt on Count

24

IV.  The Court will first examine the sufficiency of the breach of contract claim and then move on to the WPCL claims.

### A.  Count I - Breach of Contract:  Long-Term Incentive Payment

Before specifically addressing the parties' positions, the Court turns to the general principles of contract interpretation at issue in this case.

### 1.  Relevant Pennsylvania Law Contract Principles

The parties agreed that Pennsylvania law governs their contractual relationship and Pennsylvania law will be applied to analyze the Agreement.  *Kruzits v. Okuma Mach. Tool*, 40 F.3d 52, 55 (3d Cir. 1994)) ("In determining the appropriate choice of law, this Court applies Pennsylvania's choice-of-law rules. Under Pennsylvania law, 'courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them.'").  "In order to establish a breach of contract claim under Pennsylvania law, a party must show '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Broadhurst v. CitiMortgage, Inc.*, 838 F. App'x 671, 676 (3d Cir. 2020) (quoting *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)) (further quotation omitted).

Pennsylvania rules of contract interpretation require this Court to "ascertain and give effect to the intent of the contracting parties." *Murphy v. Duquesne University of The Holy Ghost*, 565 Pa. 571, 590-591, 777 A.2d 418 (Pa. 2001). Such intent is to be determined from reading the entire agreement as a whole and "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Murphy*, 565 Pa. at 591, 777 A.2d 418 (citations omitted). "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Id.* (quotation omitted).  If

the terms of a contract are unambiguous, the plain meaning of the terms of the agreement will be enforced. *Id.* To this end, Pennsylvania courts generally enforce the unambiguous terms of agreements between sophisticated parties that are freely negotiated at arm's length in order to allow the parties to such agreements the benefits of their bargains. *See McMullen v. Kutz*, 603 Pa. 602, 617, 985 A.2d 769, 778 (2009) ("freely negotiated agreements entered into at arm's length are generally enforced according to their terms to allow parties the benefit of their bargains."); *see also John B. Conomos, Inc. v. Sun Co., Inc. (R&M)*, 831 A.2d 696, 708 (Pa. Super. Ct. 2003) ("courts should not [generally] set aside terms on which sophisticated parties agreed.").

Pennsylvania law recognizes two types of ambiguities—patent and latent. *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001). "While a patent ambiguity appears on the face of the instrument, 'a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" *Bohler-Uddeholm*, 247 F.3d at 93 (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d at 614). If the terms of a contract are ambiguous, extrinsic and parol evidence is admissible to interpret the ambiguous portions of the contract. *Murphy*, 565 Pa. at 591. "A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id.* "The 'reasonably' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable." *Trizechahn Gateway LLC v. Titus*, 601 Pa. 637, 653 (Pa. 2009) (citing *Murphy*, 565 Pa. at 591). The ambiguous language of a contract is generally "construed against the [drafting party] and in favor of the other party if the latter's interpretation is reasonable." *Sun Co. v.*

26

*Pennsylvania Turnpike Comm'n*, 708 A.2d 875, 878–79 (Pa. Commw. Ct. 1998); *see also Banks Eng'g Co., Inc. v. Polons*, 697 A.2d 1020, 1023 (Pa. Super. Ct.1997) (citation omitted) ("As a general rule, agreements will be construed against the drafter only when the terms are ambiguous.").

This Court "may grant summary judgment on an issue of contract interpretation if the contractual language being interpreted 'is subject to only one reasonable interpretation.'" *Atkinson v. Lafayette College*, 460 F.3d 447, 452 (3d Cir. 2006) (quoting *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.*, 180 F.3d 518, 521 (3d Cir. 1999)).  Even if certain terms of the contract are deemed ambiguous by the court, summary judgment may still be entered in favor of one of the parties if there are no genuine disputes of material fact and it is clear that one of the parties is entitled to judgment as a matter of law.   *See McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).

### 2.   Court's Interpretation of §§ 3.3 & 5.2(c)(iv) of the Agreement

In this Court's estimation, the plain language of §§ 5.2, 5.2(c)(iv) and 3.3 of the Agreement demonstrates that Paragon is not obligated to pay Viancourt any long-term incentive payments following his termination, without cause, because there were no payments due to him under the Plan as of his termination on November 29, 2019.  *See Agreement* at §§ 3.3, 5.2, 5.2(c)(iv).  In addition, summary judgment may be entered in Paragon's favor despite the ambiguities identified in the prior ruling because the latent ambiguity, "attached Exhibit B" in the first sentence of § 3.3 can be resolved by the uncontested extrinsic evidence that no such document was created and the parties' disputes surrounding the meanings of the challenged phrases in the last four sentences and the Table in § 3.3 identified in the R&R are not relevant to the Court's analysis.  *See Bohler-*

*Uddeholm*, 247 F.3d at 93; *see also McGreevy*, 413 F.3d at 363.  The Court reaches this conclusion for several reasons.

First, the latent ambiguity in the initial sentence of § 3.3 flowing from the non-attachment of "attached Exhibit B" does not preclude the entry of summary judgment because the facts of record are uncontested that no separate Exhibit B was ever created by the parties beyond the cover sheet titled "Long-Term Incentive Plan" which states only "See attached."  *See Bohler-Uddeholm*, 247 F.3d at 93. Indeed, the record contains numerous admissions by Viancourt acknowledging that no such document was created both prior to and after the effective date of the Agreement.  *See e.g.*, Docket No. 98-2 at 92 (Viancourt email to Bellin 1/7/19 stating "While the details of the LTC are listed in the agreement, there most likely will need to be a shareholders agreement put together by your outside financial/legal counsel."); Docket No. 98-3 at 18 (Viancourt email to Bellin 11/30/19 stating that "Pursuant to Sec. 5.2(c)(iv), Long Term Incentive Plan ('Plan'). Despite Paragon failing to finalize the Plan, my employment agreement sets forth the intention of the parties in Sec. 3.3."); Docket Nos. 98 at ¶ 53; 115 at ¶ 53 ("53. Plaintiff admits that no separate agreement containing the material terms of Section 3.3 was ever created by Paragon."); *Viancourt Depo* at 116, Docket No. 98-2 ("Do you agree that Exhibit B was never created? A. Yeah […] Who was supposed to have created Exhibit B? A. I would assume Elaine.").  Since it is uncontested that the parties signed the Agreement knowing that "attached Exhibit B" did not exist and would have to be created at a later time, the Court must interpret the latent ambiguity "attached Exhibit B" to mean "to be attached Exhibit B."  *Bohler-Uddeholm*, 247 F.3d at 93.

Second, when interpreting §§ 3.3, 5.2 and 5.2(c)(iv), the Court must also consider the agreement as a whole and apply the rules of interpretation and construction as well as the

definitions that the parties expressly agreed to within the Agreement. *See Murphy*, 565 Pa. at 591.

Most relevant here, the parties agreed that:

(1) Employer "means Paragon Wholesale Foods Corp., a Pennsylvania corporation and its registered fictitious names, successors and assigns," *see Agreement* at § 1;

(2) the Plan "means the Long-Term Incentive Plan entered into between Employer and Employee," *see id.*;

(3) the Employment Period "means the period of time during which Employee is employed by Employer," *see id.*;

(4) "[t]he headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation," *see id.* at § 8.10;

(5) "[t]he rights and remedies of the parties to this Agreement are cumulative and not alternative," *see id.* at § 8.5;

The parties' Agreement also uses the typical convention that other important words or phrases are identified by using quotations with the initial letter capitalized, such as, Patrick R. Viancourt being referred to as "Employee." *See Agreement* at 1. Following these instructions from the parties, the proper interpretation of the provisions requires the Court to delete the section headings, insert the defined terms, and read the rights and remedies of the parties to be cumulative and not alternative.

The relevant portion of Section 5.2 thus states:

Effective upon the termination of the [period of time during which [Viancourt] is employed by [Paragon]] but subject to the terms and conditions hereof, [Paragon] will be obligated to pay [Viacourt] […] only such compensation as is provided in this Section 5.2

The parties agree that Viancourt was terminated, without cause, and he is seeking a purported long-term incentive payment pursuant to § 5.2(c)(iv). The pertinent language in § 5.2(c)(iv) should be read as:

> If [Paragon] terminates [Viancourt's] employment without Cause
> then […] [Paragon] will […] (iv) pay [Viancourt] any payments
> owed to [Viancourt] as of the termination of the [period of time
> during which [Viancourt] is employed by [Paragon]] under the
> [Long-Term Incentive Plan entered into between [Paragon] and
> [Viancourt]] as set forth in Section 3.3

The first two sentences of § 3.3 therefore say:

> During the [period of time during which [Viancourt] is employed by
> [Paragon]], [Viancourt] shall be eligible to participate in a long-term
> incentive payment in accordance with the [Long-Term Incentive
> Plan entered into between [Paragon] and [Viancourt]] as set forth in
> the [to be] attached Exhibit B and as modified from time to time in
> the future by mutual written agreement between [Paragon] and
> [Viancourt].  All payments under the [Long-Term Incentive Plan
> entered into between [Paragon] and [Viancourt]] will be subject to
> applicable withholding requirements.

Taken together in light of the uncontested facts in this matter, the plain language of these

provisions are properly interpreted to mean that:

- during his employment at Paragon, Viancourt is eligible to
  participate in a long-term incentive payment in accordance with
  the Long-Term Incentive Plan entered into between him and
  Paragon to be attached as Exhibit B;

- any such payments would be subject to applicable withholding
  requirements;

- upon termination, Paragon is obligated to pay Viancourt <u>only</u>
  such compensation expressly stated in § 5.2; and,

- upon his termination, without cause, Paragon is obligated under
  § 5.2(c)(iv) to pay Viancourt any payments which were <u>owed to</u>
  <u>him</u> under the Long-Term Incentive Plan as of the date of his
  termination, i.e., November 29, 2019.

*See Murphy*, 565 Pa. at 591.  However, since the parties agree that Exhibit B was never created,

and "the Long-Term Incentive Plan entered into by [Paragon] and [Viancourt]" was to be attached

as Exhibit B, it necessarily follows that no long-term incentive payments were owed to Viancourt

under the Plan as of the date he was terminated and Paragon did not breach the agreement by failing to pay long-term incentive compensation when he was fired.

Third, Viancourt's argument that he is entitled to a long-term incentive payment under § 5.2(c)(iv) and the final four sentences of § 3.3 is unreasonable and contrary to the plain language of the Agreement. *See Trizechahn*, 601 Pa. at 653. Section 5.2(c)(iv) expressly references that Viancourt is entitled to payments due as of his termination "under the Plan as set forth in Section 3.3." *See Agreement* at § 5.2(c)(iv). As the Court has already explained, the parties stipulated in § 8.10 that the Agreement should be interpreted without considering § 3.3's heading "Long-Term Incentive Plan." *See id.* at § 8.10. They also agreed that the rights and remedies of the parties were cumulative and not alternative at § 8.5; that defined terms had the meanings they ascribed to them in § 1; and other important terms and phrases were set forth separately within the Agreement in quotations with the first initial capitalized. *See id*. at §§ 1, 8.5. Viancourt's proposed interpretation does not follow these rules because the final four sentences of § 3.3 contain <u>no</u> references to the "Plan," the "Long-Term Incentive Plan" nor the moniker "LTIP" which has been utilized throughout the parties' briefs but is not in the contract. *See Agreement* at § 3.3. In addition, the final four sentences of § 3.3 do not include the word "payment," nor the phrase "long-term incentive payment." *Id*. Rather, this portion of § 3.3 refers to the "Stock Appreciation Rights Plan"; expressly notes that the "Stock Appreciation Rights Plan" is "to be attached hereto as Exhibit B"; and contains terms that the parties agree will be included "in drafting" the "Stock Appreciation Rights Plan" such as "vested equity payouts"; "payouts"; "value creation"; and, "strategic value." *Id*.

Simply put, there is no textual evidence within the four corners of the Agreement indicating that the parties intended that the "Plan" which they explicitly defined as the "Long-Term Incentive

Plan entered into between Paragon and Viancourt" is the equivalent of the "Stock Appreciation Rights Plan" which was separately identified in quotations with the first letter capitalized. "[T]he Court's task is to interpret the language of the parties' agreement and not what they may have silently intended but did not include therein." *Walsh/Granite JV v. HDR Eng'g, Inc.*, Civ. A. No. 17-558, 2019 WL 1382957, at *13 (W.D. Pa. Mar. 27, 2019) (citations omitted). Given same, the Court must interpret the "Plan" to be distinct from the "Stock Appreciation Rights Plan," the terms of which are addressed in the final four sentences of § 3.3. *See Star Ins. Co. v. Reginella Constr. Co. Ltd.*, 685 F. App'x 118, 120–21 (3d Cir. 2017) (internal quotation omitted) (finding no ambiguity because "Just as 'Ten' is not 'Twenty,' a 'corporation' cannot mean 'a limited partnership.'"). Further, the fact that the Agreement states that both the "Plan" and the "Stock Appreciation Rights Plan" were to be contained in Exhibit B does not undermine the Court's analysis because the parties agreed that the rights and remedies were cumulative such that they were free to make as many separate plans as they chose to be included in that single Exhibit B to the Agreement. *See Agreement* at § 8.5. The parties also stipulated at § 8.8 that the contract was fully integrated and could only be modified by an agreement in writing signed by both parties and at § 3.3 that the "Plan" could be "modified time to time in the future by mutual written agreement." *See Agreement* at §§ 3.3, 8.8. Hence, the Agreement itself plainly manifests the intention of the parties that the Plan would be created at a later time, in a writing signed by both parties. *See Murphy*, 565 Pa. at 591.

Next, although the Court believes these provisions are unambiguous such that extrinsic evidence is not generally relevant, the interpretation of the "Plan" and the "Stock Appreciation Rights Plan" as distinct forms of potential long-term compensation packages is supported by the other evidence in the record as well as the parties' competing arguments. *See Yocca v. Pittsburgh*

*Steelers Sports, Inc.*, 578 Pa. 479, 498 (Pa. 2004) ("Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract.").  In this regard, during negotiations, Viancourt proposed that his compensation include a long-term compensation plan wherein he noted that it could be "based on value creation in either the form of options, stock appreciation rights or another form of compensation tied to any liquidity event occurring in the three to five year time frame with puts in place beyond year five.  Opportunity to participate in share purchase program." (Docket No. 98 at ¶ 16; 115 at ¶ 16).  He admitted at his deposition that his email was "laying out different ways to have a long-term incentive." (*Viancourt Depo* at 94-95).  The multiple versions of the draft agreement likewise show that § 5.2(c)(iv) and the first two sentences of § 3.3 were never altered.  (*Compare Agreement*; Docket No. 98-2 at 93-112; Docket No. 98-2 at 121-140).  In contrast, what ended up being the final four sentences pertaining to the "Stock Appreciation Rights Plan" were added to the Agreement by Plaintiff's counsel with some minor changes made during their negotiations but there were never any corresponding adjustments made to the termination provision at § 5.2(c)(iv).  *Id*.  The GYF Report prepared in September of 2019 confirms that the company did not yet have a "Plan" or "Stock Appreciation Rights Plan" in place at that time as it notes that its purpose was for "corporate planning strategies including the implementation of a Stock Appreciation Rights ('SAR') incentive plan." (Docket No. 108-4).

Fourth, neither the cross-reference to § 5.2 nor the "[e]xcept for cause" language within the final four sentences of § 3.3 support Viancourt's interpretation of the Agreement that a long-term incentive payment was due upon his termination without cause.  Standing alone, the final four sentences of § 3.3 constitute an "agreement to agree" or preliminary negotiations which are

unenforceable as is evidenced by the parties' chosen language of "In drafting the 'Stock Appreciation Rights Plan' to be attached hereto as Exhibit B, Employer and Employee agree that it shall include, but not be limited to, the following […]."  *See e.g., Bethlehem Steel Corp. v. Litton Industries, Inc.*, 488 A.2d 581 (Pa. 1985); *Long v. TowLine River Serv., Inc.*, 568 F. Supp. 3d 535, 549 (W.D. Pa. 2021) (quoting *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298-299 (3d Cir. 1986)) ("It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract.").  To reiterate, Viancourt concedes that no separate document was ever produced to be attached as Exhibit B and, despite his position that Paragon was responsible for drafting such document, there is no language within the four corners of the Agreement allocating the risk of non-completion of either the "Stock Appreciation Rights Plan" or the Plan between these parties. *See Agreement*.  Since the final four sentences of § 3.3 are unenforceable, the severability clause at § 8.11 operates to sever that portion of the Agreement while the rest of the terms and conditions remain enforceable.  *See Agreement* at §§ 3.3, 8.11.

Regardless, the Court believes that the final four sentences of § 3.3 are not sufficient to create an obligation of Paragon to pay Viancourt additional compensation upon his termination, without cause, because he admits that he did not own any equity in Paragon at the time of his termination.  *See Agreement* at § 3.3.  With respect to the cross-reference to § 5.2, the pertinent sentence states "Employee's right to trigger, in whole or part, vested equity payouts after 72 months from Effective Date if change of control (as generally defined by federal tax law) has not occurred, or in the event of termination as expressly set forth in Section 5.2."  *Id*.  The final sentence "Except for Cause, would receive the vested % of value creation up to the date of termination" must be read in conjunction with the immediately preceding sentences which

reference "vested equity payouts" and "% payout" and likewise refer to the receipt of "vested equity payouts." *Id*. Yet, as the Court has already discussed, § 5.2(c)(iv) provides that upon a termination, without cause, Viancourt was only entitled to payments under the Plan which were due as of the termination. *Id*. at §§ 5.2, 5.2(c)(iv). Again, § 5.2(c)(iv) contains no language obligating Paragon to make "vested equity payouts" according to the "Stock Appreciation Rights Plan" to Viancourt upon his termination, without cause and it is uncontested that he owned no equity in Paragon at the time of his termination. *Id.*

Finally, the Court's interpretation of the Agreement is further buttressed by the principle applied by Pennsylvania courts that ambiguities in the contract must be construed against the drafter. *See Banks Eng'g Co.,* 697 A.2d at 1020. In fact, the prior drafts demonstrate that all of the key provisions utilized by the Court in its analysis of this Agreement were prepared by Viancourt's counsel, who produced the initial draft, and the most relevant terms were unchanged in the final version. (*Compare Agreement*; Docket No. 98-2 at 93-112; 98-2 at 121-140). Among other provisions, Viancourt's counsel drafted all of the following:

- the definitions of the "Plan," "Employment Period," and "Employer," in § 1;

- the ambiguous phrase "the attached Exhibit B" in the first sentence of § 3.3 and the inclusion of a cover page marked as Exhibit B, titled "Long-Term Compensation Plan" and stating only "See Attached" with no attachment;

- inclusion of the "Stock Appreciation Rights Plan" in quotations with the first letter capitalized in § 3.3;

- § 8.5 stating that the rights and remedies of the parties are cumulative;

- § 8.8 containing the integration and no oral modification clauses;

- § 8.10 providing that the section headings should not be used in interpreting the Agreement;

- § 8.11 stating that any provision of the Agreement held invalid or unenforceable in whole or part may be severed from the Agreement;

- the first two sentences of § 3.3 and the relevant portions of §§ 5.2 and 5.2(c)(iv) relied upon by the Court; and,

- the entirety of the Release and Waiver of Claims attached as Exhibit A which he also counseled his client to sign.

Thus, any ambiguity in these provisions would be construed against Viancourt and lend further support to the Court's interpretation of the Agreement that no long-term compensation payments under the Plan were due as of his termination and the Agreement was not breached by Paragon. *See Banks Eng'g Co.,* 697 A.2d at 1020.

       3.  <u>Conclusion</u>

To conclude, it is this Court's opinion that §§ 3.3, 5.2 and 5.2(c)(iv) of the Agreement plainly and unequivocally do not provide Viancourt with a right to long-term incentive compensation upon his termination, without cause, given the facts and circumstances of this case. "'[C]ourts are not generally available to rewrite agreements or make up special provisions for parties who fail to anticipate foreseeable problems,'" *Wert v. Manorcare of Carlisle PA, LLC*, 633 Pa. 260, 278-79 (Pa. 2015) (quoting *In re Estate of Hall*, 517 Pa. 115, 535 A.2d 47, 56 n. 7 (Pa. 1987)), and "[a] court cannot alter [a contract's] terms 'under the guise of construction,'" *TruServ Corp. v. Morgan's Tool & Supply Co.*, 614 Pa. 549, 39 A.3d 253, 260 (Pa. 2012) (quoting *Delaware County v. Delaware County Prison Employees Independent Union*, 552 Pa. 184, 713 A.2d 1135, 1138 (Pa. 1998)).  It also appears to the Court that the instant disputes were eminently foreseeable and that Viancourt and his counsel had ample opportunity to draft and propose language which may have provided him a right to long-term compensation payments under the Agreement, but they did not do so.  *See Banks Eng'g Co.,* 697 A.2d at 1020.   The Court's review of the plain

language of the Agreement, as a whole, indicates that the parties manifested an intention that they would mutually draft the "Plan" and/or the "Stock Appreciation Rights Plan" at a later time and did not allocate the risk of the non-completion of that task to either party.

For all of these reasons, the R&R's analysis of the breach of contract claim will be set aside, Paragon's motion for summary judgment will be granted as to Count I and the cross-motion for summary judgment by Viancourt will be denied.

  *B. Counts II, III, & IV: Wage Payment Collection Law*

The Court now turns to Viancourt's claims under the WPCL at Counts II, III and IV, starting with the general legal principles at issue.

  1. <u>General Legal Principles</u>

> The purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy of an employer's breach of its contractual obligation to pay wages. *See Laborers Combined Funds v. Mattei*, 518 A.2d 1296, 1298 (Pa. Super. Ct. 1986); 43 P.S. § 260.1 (WPCL authorizes legal action to collect contractually agreed upon wages). "The WPCL does not create an employee's substantive right to compensation; rather, it only establishes a statutory vehicle to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." *Scungio Borst & Assocs. v. 410 Shurs Lane Dev., LLC*, 106 A.3d 103, 109 (Pa. Super. Ct. 2014) (en banc). Therefore, the right to recover wages "earned" by employees upon separation from employment under the WPCL is a statutory remedy which supplements rather than supplants a common law action for breach of contract. 43 P.S. § 260.9a(a).

> Also at issue is an employee's right to recover liquidated damages for the untimely payment of wages due under an employment contract. Pursuant to the WPCL, a party is entitled to liquidated damages:

>> Where wages remain unpaid for thirty days beyond the regularly scheduled payday, or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employe of a proper claim or for sixty days beyond the date of the agreement, award or other

act making wages payable, or where shortages in the wage payments made exceed five percent (5%) of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter, and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

43 P.S. § 260.10 (emphasis added). *See also Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 574 (Pa. Super. Ct. 2006) ("The WPCL is not only a vehicle for recovery of unpaid wages; it also provides for damages in the event an employer withholds compensation in the absence of good faith.").

The employer has the burden of proving good faith by clear and convincing evidence. *Id.* at 575.  "[B]ad judgment does not prevent an employer from acting in good faith under the WPCL." *Hartman v. Baker*, 766 A.2d 347, 355 (Pa. Super. Ct. 2000). And where an employer holds a genuine, good-faith belief that it does not owe an employee any further wages, "[i]t remains for a jury, not the Court, to divine [the employer's] intent and decide if that excuse is genuine or reasonable in the face of the contrary evidence [Plaintiff] presents." *Kairys v. S. Pines Trucking, Inc.*, No. 2:19-CV-1031-NR, 2021 WL 2073797, at *14 (W.D. Pa. May 24, 2021).

(Docket No. 121 at 15-16).

## 2.  Analysis

At the outset, in light of the Court's decision that Viancourt has no contractual rights to long-term incentive payments under the Agreement, summary judgment must also be entered in Paragon's favor as to Count III under the WPCL which sought to enforce those non-existent contractual rights.  *See Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 957 (Pa. Super. Ct. 2011) (entitlement to compensation under WPCL determined by provisions of employment contract).

The Court next finds that summary judgment must be entered in favor of Paragon as to Viancourt's WPCL claim at Count II because he has not set forth a genuine dispute of material

fact supporting the WPCL claim, as pled, and it is well established that he cannot amend his complaint through his summary judgment motion and briefs. *See Dongelewicz v. PNC Bank Nat'l. Ass'n.*, 104 F. App'x. 811, 819 n. 4 (3d Cir. 2004) (quoting *Williams v. New Castle County*, 970 F.2d 1260, 1266 n. 4 (3d Cir.1992)) ("'a contention in a brief' 'clearly ... may not' be used to 'substitute for an allegation in a complaint.'"). On the latter point, Viancourt's summary judgment motion and briefs argue that Count II seeks recovery of liquidated damages and attorney's fees for Paragon's untimely tender of seven (7) salary continuation payments which were due between March 27, 2020 and June 19, 2020 but he has not pled any such claim in his Amended Complaint. (Docket No. 25). The Court set a deadline for pleadings to be amended by February 11, 2021, (Docket No. 50), no such amendments were ever made, and Viancourt has neither acknowledged the deadline nor set forth "good cause" to set it aside as is required under Rule 16. *See Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84 (3d Cir. 2010) (party seeking leave to amend after deadline expires must show "good cause" and demonstrate that it acted with "due diligence").

In any event, Count II expressly seeks recovery of a single unpaid salary payment from December 6, 2019 in the amount of $11,230.77 because Paragon initially contended that the payment it made on that date was the first salary continuation payment while Viancourt maintained it was the final payment of his salary through the date of his termination on November 29, 2019. (Docket No. 25 at ¶¶ 52-59). He brought this count at a time when the payments were ongoing and asserted that this dispute would ultimately result in Paragon making one less payment than he believed he was entitled to receive under the Agreement which called for twelve (12) months of biweekly payments (or a total of 26) starting on December 20, 2019. (*Id.*). At this stage, it is clear that there are no genuine disputes of material fact and that Viancourt has not presented sufficient

evidence to support Count II because he now admits that the payment he received on December 6, 2019 was a salary payment and that all 26 salary continuation payments were made through December of 2020.  (Docket No. 114 at 28 ("Paragon did ultimately make all 26 of Plaintiff's Salary continuation payments (properly excluding the December 6, 2019 payment), with the final payment made in December of 2020.")).  Since Viancourt was paid all of the amounts due as salary and salary continuation payments under the Agreement and failed to amend his pleading a second time by the deadline of February 11, 2021 to bring the claim he now wants to prosecute, summary judgment is entered in favor of Paragon and against Viancourt as to Count II.  *See Banks Eng'g Co. v. Polons*, 697 A.2d 1020, 1024 (Pa. Super. Ct. 1997) ("Because the only amount of 'wages' at issue instantly is the amount in dispute, and because appellant conceded that he was paid all of the commissions he earned, the Act does not afford appellant a remedy.").

The Court's final task is to resolve the parties' cross-motions for summary judgment as to Count IV under the WPCL seeking liquidated damages and attorneys' fees for the delayed payment of the Annual Performance Bonus.  (Docket Nos. 96, 99).  Both parties object to the R&R's conclusion that there were genuine disputes of material fact as to whether Paragon had a good faith basis to not pay the bonus to Viancourt due to its financial circumstances.  (Docket Nos. 122-123; 125-127).  Paragon also argues that the R&R failed to consider its position that it is entitled to summary judgment because the breach of contract claim related to the bonus was settled and Viancourt was paid his bonus before he asserted any claims against Paragon under the WPCL. (Docket No. 122; 126-127).  Having carefully considered the parties' positions, the Court finds that there are no genuine disputes of material fact and that Viancourt is entitled to judgment as a matter of law because Paragon has not presented clear and convincing evidence supporting its

"good faith" defense and the parties' settlement of the breach of contract claim does not preclude Count IV.

Initially, the Court rejects the R&R's recommendation that genuine disputes of material fact as to the inability of Paragon to pay the bonus precludes summary judgment in this case. (Docket No. 121).   While the Court certainly agrees that the COVID-19 pandemic had an unprecedented impact on all of us, including businesses such as Paragon, those events are insufficient to demonstrate that Paragon has set forth evidence supporting a "good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim […] accounting for such non-payment." 43 Pa. Stat. Ann. § 260.10.  To the contrary, the Superior Court held in *Laborers Combined Funds of Western Pennsylvania v. Mattei*, that neither the financial condition of a company nor third party acts of embezzlement which prevented timely payment of wages supported a "good faith" defense under § 260.10.  518 A.2d 1296, 1300 (Pa. Super. Ct. 1986).  The Superior Court recognized:

> as we read the Act […], a "good faith contest" should be premised upon some impropriety on the part of the employee/obligee affecting his right to his "wages", in this case pension and other welfare benefits, due him from the obligor. Under the particular circumstances here, we fail to see how the actions of a third party (embezzler) affects a right owed a signator to a bilateral agreement which has been faithfully adhered to by the obligee.

*Id.* at 1301; *Keegan v. Fahnestock & Co., Inc.*, 1996 WL 530000, at *12 (E.D. Pa. Sept. 16, 1996) ("good faith" under § 260.10 is any "contest or dispute" which "would lead a reasonable person to find a legitimate dispute as to whether wages were due.").  More recently, the Superior Court noted that "our case law establishes that bad faith is more than bad judgment, but an employer cannot prove good faith by post-hoc justifications for its failure to pay," and affirmed the imposition of the liquidated damages when there was no credible dispute as to the entitlement to

wages but the evidence showed only that the employer "did not have the money available to pay." *Yablonski v. Keevican Weiss Bauerle & Hirsch LLC*, 197 A.3d 1234, 1241 (2018).  In addition, the Superior Court emphasized in *Braun v. Wal-Mart Stores, Inc.*, that the issue is "whether the employer had a good faith basis for contesting or disputing the wage claim at the time the employer challenged the wage claim" which "prevents an employer from invoking a justification, legal or otherwise, after the fact."  24 A.3d 875, n. 33 (Pa. Super. Ct. 2011).

Here, Paragon has never disputed that Viancourt was entitled to the full amount of the bonus claimed, $173,734.16.  Indeed, Bellin emailed Viancourt on December 13, 2019 shortly after his termination and told him he was "entitled to receive a pro-rated annual bonus in the amount of $173,734.16 payable on or before April 15, 2020."  (Docket No. 98-3 at 16).  During this litigation, Paragon repeatedly admitted that the full bonus was due, never raised any dispute as to his entitlement to the bonus nor the amount and ultimately paid Viancourt the full amount of $173,734.16.  (*See e.g.*, Docket No. 15 at ¶ 29; *Bellin Depo* at 170; Docket No. 97 at Docket No. 114 at 28).  While Paragon submits that the COVID-19 pandemic should excuse its delayed payment, the statute provided it with a full 60 days beyond the due date (or until June 15, 2020) to pay the bonus without incurring the requested penalty of 25% liquidated damages.  *See Mattei*, 518 A.2d at 1300 ("a breach of contract, not an excuse for failing to perform, is the correct appellation.").  Paragon received a PPP loan for over $2.3 million on April 4, 2020 and while the company expressed interest in settling during the summer months, it elected to delay Viancourt's payments until July 31, 2020.  (Docket No. 98-4 at 16-17).  As such, the parties' disputes as to whether Paragon had the financial ability to pay Viancourt or not between April 15, 2020 and June 15, 2020 are not material and do not preclude the entry of summary judgment here.

Paragon next contends that Count IV is barred by the parties' settlement of the underlying breach of contract claim before it was added to this lawsuit.  The Court disagrees for several reasons.

First, Paragon has not cited any binding authority for the proposition that a plaintiff can waive a claim for liquidated damages under the WPCL by settling the underlying breach of contract claim and such interpretation runs counter to the plain language of the statute.  (*See* Docket Nos. 97; 118; 122; 125; 127).  Relevant here, § 260.9a provides that "[a]ctions by an employe[e], […] or party to whom any type of wages is payable to recover unpaid wages and liquidated damages may be maintained in any court of competent jurisdiction."  43 Pa. Stat. Ann. § 260.9a.  Although Paragon had satisfied the unpaid back wages by the time the Amended Complaint was filed, Viancourt was still owed additional salary continuation payments by Paragon such that he was undoubtedly a "party to whom any type of wages is payable."  *Id*.  Hence, the statute authorizes him to bring an action to "recover unpaid wages and liquidated damages."  43 Pa. Stat. Ann. § 260.9a.  Viancourt has also cited to at least one case where a standalone claim for liquidated damages was tried to a jury verdict despite the back wages being satisfied prior to the filing of the lawsuit.  *See Bair v. Purcell*, 1:04-CV1357, 2010 WL 3282653, at *2, 7 (M.D. Pa. Aug. 17, 2010) (where employer fully paid claimed back wages, leaving only propriety of liquidated damages for untimely payments, employee entitled to reasonable attorneys' fees where employer lacked good faith basis for untimely payments).

Second, the Court generally agrees with Paragon that the email correspondence between counsel, their statements in the Rule 26(f) Report and their subsequent conduct whereby Paragon paid the bonus to Viancourt and he dismissed that portion of his breach of contract claim constituted a settlement because all of the essential elements of a settlement have been met.  *See*

*Toppy v. Passage Bio, Inc.*, 285 A.3d 672, 682 (2022) (citing *Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 526 Pa. 541, 587 A.2d 1346, 1349 (1991)) ("Like any contract, to be enforceable, a settlement agreement must possess all the elements of a valid contract: offer, acceptance, and consideration.").   However, Paragon has not presented any evidence indicating that the parties manifested an intent that the settlement of the breach of contract claim would preclude Viancourt from bringing an action for liquidated damages under the WPCL. *See Myers v. AutoZoners, LLC*, Civ. A. No. 16-1312, 2017 WL 6316586, at *7 (W.D. Pa. Dec. 11, 2017) (enforcing settlement terms but finding that parties had not agreed to general release as part of same); *see also Yablonski*, 197 A.3d at 1242 (although settlement was reached, "[n]othing in the record indicates that Yablonski agreed to reduce KWBH's liability for liquidated damages.").   Beyond this deficiency, Pennsylvania law is "clear and well settled that an attorney must have express authority in order to bind a client to a settlement agreement." *Reutzel v. Douglas*, 870 A.2d 787, 789-90 (Pa. 2005).   Yet, there is no evidence that Viancourt specifically agreed to waive or release a claim under the WPCL nor expressly authorized his attorney to do so on his behalf.  *See Myers*, 2017 WL 6316586, at *10.

Third, despite numerous opportunities, Paragon has not asserted that Viancourt's execution of the Release on December 4, 2019 precludes the WPCL claim.  (Docket Nos. 97; 122; 125; 127).  The language utilized by the parties is broad and purports to release "any and all claims […] liquidated damages [and] attorneys' fees" arising out Viancourt's employment, but expressly limits his release to claims under "Federal, state or local law (statutory, regulatory or otherwise) that may be legally waived and released." *Agreement* at Ex. A.  The Superior Court has explained that "although the WPCL permits an employee 'to settle or adjust his claim for unpaid wages,' 43 P.S. § 260.9a(b), the WPCL's provisions may not be waived by private agreement. 43 P.S. §

260.7." *Yablonski*, 197 A.3d at 1242.  On this point, the WPCL states that "[n]o provision of this act shall in any way be contravened or set aside by a private agreement," 43 P.S. § 260.7, and courts have found that contractual provisions purporting to avoid the WPCL are unenforceable. *See e.g., Banks v. ManpowerGroup, Inc.*, No. 4:14-CV-02483, 2015 WL 4207236, at *3 (M.D. Pa. July 10, 2015).  Courts have also held that conditioning payment of an undisputed amount of wages on the signing of a release violates the WPCL.  *See Bandy v. LG Indus., Inc. Equivalent Ownership Plan*, Civ. A. No. 02-7359, 2003 WL 21499017, at *6 (E.D. Pa. June 23, 2003) ("By putting a condition the signing of a release on the payment of even the undisputed amount owing the Plaintiffs, the Defendants violated the WPCL.").

Overall, the Court finds that there is no genuine dispute of material fact and that Viancourt is entitled to summary judgment as to Count IV because Paragon never contested that he was entitled to the full amount of the bonus and did not pay him within 60 days of the due date.  *See* 43 P.S. § 260.10.

### 3.  Conclusion

For the reasons set forth above, the R&R's analysis of the WPCL claims will be set aside and both parties' motions for summary judgment as to the WPCL claims will be granted, in part and denied, in part.  Summary judgment will be granted in favor of Paragon as to Counts II and III and in favor of Viancourt as to Count IV.

## V.   CONCLUSION

Based on the foregoing, the R&R [121] is adopted, in part, and set aside, in part, and the parties' cross-motions for summary judgment [96] [99] are granted, in part and denied, in part. Specifically, summary judgment is entered in favor of Paragon and against Viancourt as to Counts I-III and summary judgment is entered in favor of Viancourt and against Paragon at Count IV.

Finally, Count V is dismissed as the parties reported that claim was resolved.   An appropriate Order follows.

_s/Nora Barry Fischer_
Nora Barry Fischer
Senior U.S. District Judge

Dated: March 31, 2023

cc/ecf:  All counsel of record.